## Gray *versus* The Commonwealth.

1. The refusal of the court below to grant a new trial cannot be made the subject of an assignment of error. Capital cases are no exception to this rule, and in them if a new trial is refused where upon the evidence it ought to have been granted, and the judgment is affirmed in the Supreme Court on the law of the case, the only remedy is an appeal to the pardoning power.

2. A confession is not evidence in a capital case in absence of proof of the corpus delicti, but that fact need not be proved beyond the possibility of doubt but is to be found by the jury like any other fact in the case. The rule is: when the Commonwealth has given sufficient evidence of the corpus delicti for the case to go to the jury, it is competent to show a confession made by the defendant connecting him with the crime.

3. The identity of a human skull and jaw-bone may be proved by persons who were familiar with the formation of the teeth and jaws of the person whose skull it was alleged to be.

4. At the trial of a capital case it was shown that the deceased, a woman of middle age, suddenly disappeared, under circumstances which tended to show that her disappearance was involuntary and at a time during which the prisoner was known to have been in the vicinity. The prisoner had more than once been heard to threaten the life of the deceased, and had several times visited her house. About a year afterwards, a human skull and a jaw-bone were found near the residence of the deceased showing the marks of deadly wounds. A lock of hair still attached to the skull was similar to that of the deceased, while the jawbone was identified as hers by persons who recognized peculiarities in its structure. *Held*, that these circumstances constituted sufficient proof of the corpus delicti to render a confession of the prisoner admissible in evidence.

October 23d 1882. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and GREEN, JJ. STERRETT, J., absent.

ERROR to the Court of Oyer and Terminer of *Westmoreland county :* Of October Term 1882, No. 142.

This was an indictment against Silas S. Gray for the murder of Mary McCready.

Upon the trial, before HUNTER, P. J., the Commonwealth proved that Mrs. Mary McCready on and prior to February 1877 lived in a small house on the Kiskiminetas river, two miles above Paulton, in Westmoreland county. Upon the 20th day of February 1877, Mrs. McCready disappeared and was never seen subsequently by any of her neighbors. Her son James McCready, who was at that time about ten years of age testified : " I saw her last in the morning. I don't remember what she was doing that morning. I saw her in the house when I started to school, about 8 o'clock in the morning. It was after 4 o'clock when I got back in the evening—near about 4 o'clock, on the

same day I went home and mother was not there. I went into the house, but there was nobody there. There was nobody at home. I staid around there till about dark, then I went up to Daugherty's. When I went to the house the door was not locked. There was a good fire on and a couple of the bureau drawers were standing open. They were the middle drawers. I don't remember what kind of clothing my mother had on that morning. She had on just her every-day dress. After I went up to Daugherty's, I came back to the house on Wednesday, I believe—the next day—I think it was on Wednesday morning, I found nobody there. I found the house that morning just the way I left it the evening before. I don't remember of finding anything. Mrs. Lawrence's boy went with me. My mother's clothing was in the house. There were some dresses—a shawl and a bonnet. She had some good clothing, and working clothes. They were there. . . . . There was a good fire when I came home from school. It was a grate in the room. It does not seem to have been covered. There was just a big lump of coal lying on it. There were no indications of supper being prepared. The table was not spread for supper. I stayed around till dark and then went to Mr. Daugherty's."

It was further proved that on April 4th 1878, a fishing party on the Kiskiminetas found a human skull near the bank of that river about eight feet from the edge of the water on a sand bank which extended some distance into the river and was covered with water when the river was high. Near the skull was a lower jaw-bone imbedded in the sand. A few locks of dark hair mixed with gray about ten inches long adhered to the skull. There were the marks of two wounds: a blow upon the temporal portion of the skull and a cut upon the top of the head, either of which in the opinion of the medical witnesses, would be sufficient to produce death. By the time of the trial (May 23d 1882) the hair attached to the skull had disappeared, probably on account of the handling to which it was subjected during the four years, and Dr. William McBriar, one of the medical witnesses, was asked the following question:—

Q. Supposing a skull was found yesterday on which there was attached hair ten inches long hanging from the occipital bone, what would be your inference in that case?

A. From the custom and habit of wearing the hair nowadays I would infer that it was the skull of a female.

The defendant's counsel moved the court to strike out the above question and answer. The motion was denied. Exception. (Sixth assignment of error.)

Witnesses for the prosecution testified that the defendant had been seen in the neighborhood of Mrs. McCready's about

the time of her disappearance but did not notice anything peculiar about him except that he was extremely dirty.

The Commonwealth called Mrs. Lawrence, a neighbor of Mrs. McCready, to prove that she, Mrs. Lawrence, was well acquainted with Mrs. McCready—that the last time she saw her was about a week before she was missing—that at that time witness expected to be confined, and had, or did make, at that time, arrangements with deceased to wait on her during her confinement, which she was soon expecting.

This offer was objected to. Objection overruled and evidence admitted. Exception. (First assignment of error.)

H. A. Rudolph testified that he was well acquainted with Mrs. McCready and during a period of two years was in the habit of eating at the same table with her. The Commonwealth offered to prove by him that he was well acquainted with Mrs. McCready in her life and that there were certain marks about her head, and particularly about her lower jaw-bone and the teeth therein, and that the witness is able to identify this particular jaw-bone and skull from these peculiarities." Objected to. Objection overruled and evidence admitted. Exception. (Second assignment of error.)

Mary McCready a daughter of the deceased, was asked by the prosecution " From what you know of your mother's lower jaw, state whether or not you believe this jaw to be that of your mother ? Objected to on the ground that the witness is not competent to give an opinion and that the conclusions from these facts are for the jury. Objection overruled. Exception. (Fifth assignment of error.)

The witness testified in answer to this question : " That lower jaw looks very familiar to me. . . . . From my knowledge of my mother's jaw and from the appearance of that jaw, I believe it to be my mother's." Upon cross-examination she said : " Mother had just a few teeth in her upper jaw, here in front. She had none back, only decayed teeth, roots like, back. I don't know how many. There was nothing back of the eye teeth on each side only roots like, decayed teeth. I can't just tell whether the last teeth were the eye teeth, but I know all she had was a few in front. There was no double teeth on either side above, that I can remember, but there was some roots of decayed teeth back on each side."

Mrs. Mary Mason testified that about the time of Mrs. McCready's disappearance she had heard the defendant say that he would kill Mrs. McCready before he would leave the place. The objection of defendant to this testimony was overruled. Exception. (Third assignment of error.)

The Commonwealth then called Johnston Dixon, who testified that in March 1878 he was a fellow prisoner of Gray's

[Gray *v.* Commonwealth.]

in the Armstrong county jail at Kittanning, where Gray was confined for another offence, and that Gray had at that time made the following confession: "He told me he had a hatchet, and and had struck her on the side of the head with the hatchet, and the woman fell to the ground, and he was afraid she wasn't dead, so he turned the axe end of the hatchet and hit her on the top of the head. Then he had taken the hatchet and rolled it up in her bonnet and buried it along side of a log, along the road, between the railroad and the river, and .then he had tied a string around her neck and tied a stone to the other end of it and throwed her into the river. He told me he had throwed her into the river some place above Apollo, handy to some dam. I don't know where the place is. I never was there, to the best of my knowledge . . . I have never seen the skull." The offer of this evidence had been objected to, and the objection overruled. Exception. (Fourth assignment of error.)          •

The defendant introduced testimony chiefly attacking the credibility of Rudolph and expert testimony to show the impossibility of identifying a skull in the condition of the one found.

The court in its general charge said inter alia: " [Threats are competent evidence when the corpus delicti, or the offense itself, has once been shown. They do not, of themselves, give rise to a presumption of law of guilt, but, taken with other circumstances, an inference of guilt may be logically inferred.] [Where a threat is repeated, however, it would gather force by the repetition.]" ·(Ninth assignment of error.)

Verdict of guilty of murder in the first decree. A motion for a new trial and in arrest of judgment was made and refused and on August 26th 1882 the defendant was sentenced to be hanged.

The defendant took this writ of error, assigning for error, inter alia, the rulings of the court upon the offers of evidence, those portions of the general charge of the court included above within brackets, and the action of the court in refusing to grant a new trial as set forth in the following assignments of error:

10th. The court erred in not granting a new trial for the reason "That the jury acted improperly, in that on the Saturday evening pending the trial they allowed the door of their room, at the hotel, to stand open, the people to collect at the door, and one of the officers in charge of the jury to remain seated inside of the room with them."

11th. The court erred in not granting a new trial for the reason "That the district attorney in addressing the jury, while commenting upon the testimony, character and credibility of the witness, Johnston Dixon, remarked that the said Dixon was convicted of horse-stealing for the reason that he, the said Dixon, and his wife, could not be witnesses in his behalf to show

that he had traded for the horse honestly, and did not steal him; whereas the evidence showed that he was tried and convicted in the Court of Quarter Sessions of Armstrong county, Pennsylvania, at —— Term 1878, almost one year after the Act of 24th March 1877, allowing defendants to testify in their own behalf, had become a law, thereby misleading the jury as to the credibility of the witness, Dixon."

*Gill* (with whom was *Latta*), for the plaintiff in error.

*S. A. Kline,* district attorney, *D. S. Atkinson* and *A. M. Sloan,* for the Commonwealth, defendant in error.

Mr. Justice PAXSON delivered the opinion of the court, November 20th 1882.

• This cause was argued here as upon a motion for a new trial, and two of the assignments of error are to the refusal of the court to grant it. We ought not to be called upon at this late day to say that it is not within the line of our recognized duties to correct supposed errors in the lower courts in this manner. Nor are capital cases an exception to this rule. We are not jurors, and are not called upon to weigh the evidence even when a human life is at stake, further than to say, when called upon to do so in an orderly manner, whether there is sufficient evidence to submit to the jury upon a particular question of fact. If the jury make a mistake the remedy is a motion for a new trial in the court below. If a new trial is refused where upon the evidence it ought to have been granted, and the judgment is affirmed here upon the law of the case, the only remedy is an appeal to the pardoning power. It is foreign to our duties to interfere in such cases, nor do we see that any practical good would result from our assuming such a jurisdiction. It is better for the administration of the criminal law that each department of the government concerned therein should confine itself to those duties which the law has assigned to it, and which long experience has shown to be wise and proper.

The foregoing remarks are made without any reference to the merits of this particular case, and seemed to be called for by the manner in which it was presented. I will now proceed to discuss briefly the questions of law presented by the record.

The principal points pressed upon the argument at bar were, 1st. That the *corpus delicti* was not sufficiently proved, and 2d. That in the absence of such proof evidence of the prisoner's confession was improperly received. The 2d and 5th assignments of error were intended to cover the first proposition, but they fall short of it. They merely allege error in admitting the testimony of H. A. Rudolph and Mary McCready stating

[Gray v. Commonwealth.]

their belief, and the grounds of it, that the skull and jaw bone, produced before the jury, were those of Mrs. McCready, the deceased, for whose murder the prisoner was indicted. That this evidence was competent is too clear for argument. The witness Mary McCready was a daughter of the deceased; the witness Rudolph knew her well; she had eaten at his table for over two years, and each testified to certain pecularities of jaw and teeth, from which they had respectively formed the opinion above referred to. It was no answer to this to say that Rudolph was not a credible witness, and that Mary McCready was mistaken as to some of the teeth in the jaw. These were questions affecting the weight of the evidence and were entirely for the jury. Witnesses were called to impeach Rudolph; others were called to sustain him. The jury evidently believed him, and we cannot say they were wrong. It would be a serious thing to impute perjury to a witness for the Commonwealth in a capital case. A jury would hesitate to do so, while they might think he was mistaken, or that his opinion or belief of a fact was not founded upon a sufficient basis. It was argued that Mary McCready's testimony was unreliable; that in point of fact she proved the jaw was not her mother's, because she said her mother had no back teeth; only front teeth. What she did say was this: "There was no double teeth on either side above that I can remember, but there was some roots of decayed teeth back on each side . . . only decayed teeth, roots like, back." Now, the fact, which appears to be conceded, that the deceased had three back teeth, would not affect the competency of the testimony of the witness, and might not impair her credibility with the jury. It is certainly not a question for our consideration upon a writ of error.

The testimony referred to was not the only evidence of the *corpus delicti.* It had previously been shown that the deceased disappeared about the middle of February 1877 under circumstances which pointed strongly to her death by violence. She was a woman of about fifty years of age, in humble life, living with her son, a lad of about 12 years of age, in a small log cabin on the Kiskiminetas river in Westmoreland county. The little boy testified that he last saw his mother on the morning of her disappearance, at about 8 o'clock, that they ate breakfast together, and that, when he returned from school about 4 o'clock in the afternoon, his mother was not there, and that he never saw or heard of her since. Nothing about her house appears to have been disturbed; the fire was burning in the stove, but there were no indications of any preparation having been made for supper; everything about the house seemed to have been in order; all the furniture, carpet, bedding, chairs, and the wardrobe of the deceased, shawls, dresses and other articles of cloth-

5 Outerbridge—25

[Gray *v.* Commonwealth.]

ing were there.   It further appeared that the deceased was not in the habit of going from home.   The evidence showed that she was a home woman, and her sudden disappearance was a surprise and a mystery to all her neighbors, the more so when it became known that her humble home with its furniture and clothing were found in the precise condition as on that morning when her little son left for his school.   Search was made for her, but it proved fruitless; inquiries were equally vain, nor was there anything shown which might allure her from her home or to raise a suspicion that she had committed suicide.   Prior to her disappearance the prisoner on more than one occasion had threatened to take her life; he knew her and had several times visited her house, and it was proved that some time before her disappearance he had been in the neighborhood.   On the 4th of April 1878 a human skull was found on the river shore near the house in which Mrs. McCready lived.   The hair attached to the skull was evidently that of a woman ; it was black and gray, corresponding to the hair shown to have belonged to her.   The skull showed marks of violence ; there were two wounds, either of which would be sufficient to produce death.   The jaw-bone found near the skull was identified by the witness Rudolph, and by Mary McCready as the jaw-bone of the deceased, by reason of certain peculiarities which they described.

Under these circumstances we cannot say it was error to admit the prisoner's confession.   While it is familiar law that a confession is not evidence in the absence of proof of the *corpus delicti*, yet I am not aware of any case which holds that the *corpus delicti* must first be proved beyond the possibility of doubt.   It is a fact to be proved like any other fact in the cause, and be found by the jury upon competent evidence.   The true rule in such cases is believed to be this : when the commonwealth has given sufficient evidence of the *corpus delicti* to entitle the case to go to the jury, it is competent to show a confession made by the prisoner connecting him with the crime. Under such circumstances the jury should first pass upon the sufficiency of the evidence of the *corpus delicti*.   If it satisfies them beyond a reasonable doubt that the crime has been committed, then they are at liberty to give the confession such weight as it is entitled to, taking into view the circumstances surrounding it, and the extent to which it has been corroborated. There is no rule of the criminal law which requires absolute certainty about this or any other question of fact.   If it were otherwise, it would be impossible to convict of any offence in any case.   All the law requires is that the *corpus delicti* shall be proved as any other fact, that is, beyond a reasonable doubt, and that doubt is for the jury.

The identity of a human body, or even of a skeleton, may

[Gray *v.* Commonwealth,]

be proved by circumstances, as may any other fact: Rex *v.* Hindmarsh, 2 Leach's Crown Cases 569 ; McCulloch *v.* The State, 48 Ind. 109.   When all other means of identification fail, the hair and teeth form the chief means of recognition : Wharton's Crim. Ev. § 804.   In the case of Udderzook *v.* The Commonwealth, 26 P. F. S. 340, a mutilated body, whose face was discolored and swollen, was found, having been apparently buried for some days; the witness who found it had never seen the person before.   He was allowed to testify that the face resembled a photograph of a person alleged to be the one found : the question whether the witness could identify it was for the jury.   So we say here, the question whether Rudolph, and Mary McCready could identify the jaw found as that of the deceased was for the jury.   It would have been bald error for the court below to have excluded their testimony.   We are in no sense responsible for the view which the jury took of it, and it would be dangerous, even if we had the power, to attempt to review their finding.

The confession of the prisoner as detailed by the witness Dixon was corroborated in a remarkable degree; not only was the skull found in the immediate vicinity of the place where the prisoner said he threw the body, but the wounds correspond precisely with those the prisoner said he inflicted.   From all that appeared, the locality was unknown to the witness; he had never seen the skull, and the facts could only have been known to him from the statements of the prisoner.

This disposes of the 2d, 4th, and 5th assignments of error. The evidence referred to in the 1st assignment, even if incompetent, which is by no means clear, was immaterial, and could have done the prisoner no harm, while the evidence of the threats which is complained of in the 3d assignment was entirely competent.   The 6th assignment is not sustained.   While the testimony of Dr. McBriar, in regard to the hair, was not important, it was not error to admit it.   The 10th and 11th assignments allege error in refusing a new trial, and do not require discussion.   The remaining assignments refer to the charge of the learned judge and his answers to points.   A careful examination of them fails to disclose any substantial error.

The judgment is affirmed, and it is ordered that the record be remitted to the Oyer and Terminer for the purpose of execution.