## STATE *vs.* HENRI DESLOVERS.

### MARCH 2, 1917.

PRESENT:  Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

*(1)  Criminal Law.  Jeopardy.  Habeas Corpus.*

Where a defendant, indicted for murder, was discharged on *habeas corpus*, as having been detained in violation of Gen. Laws, 1909, cap. 354, § 17, providing that every person who shall be indicted for murder and shall be imprisoned, shall be tried · or bailed within six months next after the time at which he shall plead to such indictment, if he demand a trial, such discharge is not a bar to another indictment for the same offence.

*(2)  Criminal Law.  Trial.*

In a prosecution for murder of a woman, where the order of proof rests in the discretion of the court, it was not error to permit the State to offer evidence concerning her relations with defendant, where before the introduction of such testimony it had sufficiently appeared in evidence, that a woman had come to her death through the criminal agency of some person, but it had not then been established either by direct or circumstantial evidence that the body was that of the woman whose death defendant was charged with, nor had any evidence been introduced tending to connect defendant with the crime.

*(3)  Criminal Law.  Evidence.*

In a prosecution for murder of a woman, a witness was properly permitted to testify as to the height and weight of the woman claimed to have been murdered, whom she had known for a considerable period, as compared with her own, for the purpose of identifying the body as that of that woman, the witness at the time not being acquainted with her own height and weight, such statements not being mere expressions of opinion, but admissible for what they were worth as pointing differences between the woman and herself.

*(4)  Criminal Law.  Evidence.  Harmless Error.*

Where there was other evidence in the case bearing on the question of identification, technical error in the admission of evidence on that question is harmless.

*(5)  Criminal Law.  Evidence.  Refreshing Recollection.*

Where a witness had a short time before testifying refreshed his recollection by an examination of a record, in contemplation of the evidence which he was about to give, the defendant is entitled to see and have the benefit of the record, in cross-examination, although the witness did

not have the record immediately before him when he gave his testimony, and refusal of the court to permit defendant to examine the record constituted reversible error.

*(6) Criminal Law. Evidence. Refreshing Recollection.*

Where a witness, upon having his previous testimony read to him, and being asked whether he had made such statement, consulted a record in making his answer, it was error to refuse permission to defendant to examine the record, for the purpose of showing, if he could, that the statement of witness was inconsistent with the earlier memorandum from which he claimed to have refreshed his memory.

*(7) Criminal Law. Evidence. Record of Autopsy.*

In a criminal prosecution it was error for the court to deny the request of defendant for the reading of the record of the autopsy, by the medical examiner who had conducted it and had appeared as a witness for the prosecution.

*(8) Criminal Law. Evidence. Witnesses. Privilege.*

In a criminal prosecution for murder, the State was properly permitted to interrogate a witness for the defence, as to the contents of a letter written by her to her husband, who was not accused of any complicity in the crime with which defendant was charged, the apparent purpose being to show the interest of the witness affecting her credibility, the communication not being privileged under the decisions in this State, which accord a witness the privilege of objecting to testifying on the ground that such testimony would tend to criminate a husband or wife, but, in a proceeding which could never be used against the husband or wife, forbid such objection to be raised by a third person, and which also hold that even the husband or wife of an accused offering himself or herself as a witness cannot be excused from testifying because of such relationship.

*(9) Criminal Law. Evidence Interpreters.*

It is the duty of an interpreter to interpret and repeat to the court every statement made by the witness whose evidence he interprets, and he has no discretion or power to determine what is admissible and what is not admissible, or to omit to interpret what he considers hearsay; his power is ministerial only.

The power to determine whether answers are responsive belongs to the court and must be exercised by it and cannot be delegated to the interpreter.

*(10) Criminal Law. Evidence. Interpreters.*

While it was error for the court to refuse to permit the translation of an answer of witness to be completed so that its admissibility might be passed upon by the court, such refusal was harmless where, upon an almost immediate repetition of substantially the same question, the witness repeated his answer, which was fully translated.

*(11)　Criminal Law.　Evidence.　Interpreters.*

Although the translated parts of answers pointed to their inadmissibility and suggested that the remainder was also founded upon hearsay or was not responsive, the court cannot act upon that assumption without knowing all that the witness had said. The court can obtain the translation and hear counsel aside from the jury, and decide what part should go upon the record, and while refusal to obtain the full translation of an answer before ruling upon it would be error, such error was harmless where one of the counsel for defendant was well versed in both the language of the witness and of the court, so that if the untranslated portion of the answer contained anything admissible it could have been brought out by further questions.

*(12)　Criminal Law.　Evidence.　Interpreters.*

In the selection, appointment and retention of an interpreter, as well as the manner of conducting an examination through him, the trial court is vested with a large discretion which will not be interfered with unless an injustice to the complaining party clearly appears.

*(13)　Criminal Law.　Evidence.　Interpreters.*

Where the record shows that an interpreter was incompetent and unable to discharge his duties in a manner calculated to insure to the defendant a fair trial, it was the duty of the trial court, upon such fact becoming apparent, to appoint some one else, and the failure to do so upon request constituted prejudicial error.

*(14)　Criminal Law.　Trial.　Remarks of Court.*

In a criminal prosecution where, the defendant's counsel having asked that he might be heard, the court said, "We cannot waste time that way," and at another time, defendant's counsel having requested the court to instruct the witness to make her answers responsive, the court said, ".I believe the witness is trying to do the best she can," such remarks constituted reversible error.

*(15)　Criminal Law.　Circumstantial Evidence.*

In a prosecution for murder, both the *corpus delicti* and the perpetration of the crime by defendant may be shown by circumstantial evidence, if it is sufficient to support the verdict of the jury.

*(16)　Criminal Law.　New Trial.　Interpreters.*

The incompetence of an interpreter cannot be included among the grounds in a motion for a new trial.

SWEETLAND, J., dissents.

INDICTMENT FOR MURDER. Heard on exceptions of defendant and certain exceptions sustained.

VINCENT, J. On May 6, 1913, the defendant, Henri Deslovers, was indicted by the grand jury for the murder of one Angele Parmentier. On May 19, 1913, he was arraigned and pleaded not guilty, whereupon his trial proceeded, extending over a period of twenty days, and resulted in a verdict of guilty. During the course of the trial the defendant took two hundred and nineteen exceptions, of which one hundred and two have now been abandoned, leaving one hundred and seventeen for our consideration. The questions raised by these exceptions are summarized by the defendant in his brief, as follows:

" I.   Did the Trial Court err in sustaining the demurrer of the prosecution to the defendant's plea in abatement, and in denying his motion for discharge?

II.   Did the Trial Court err in permitting certain witnesses to give evidence concerning Angele Parmentier and her relations with defendant, when there was no evidence before the jury that the body found was that of Angele Parmentier?

III.   Did the Trial Court err in permitting Emma Boell to testify as to her opinion of height, etc., of Angele Parmentier?

IV.   Did the Trial Court err in imposing upon the defendant Andre Blanchard as interpreter for certain witnesses for both the State and the defendant?

V.   Did the Trial Court err in denying the defendant's request that the interpreter be instructed to complete the translation of certain answers left incompletely translated?

VI.   Did the Trial Court err in denying counsel for the defendant the right to ask of certain witnesses questions purporting to impeach them?

VII.   Did the Trial Court err in refusing to allow counsel for the defendant to inspect a certain book or memorandum used by Dr. Myers, while on the stand, to testify from?

VIII.   Did the Trial Court err in permitting the prosecuting attorney to ask questions of certain witnesses regarding disputes, quarrels, and relations existing between Angele Parmentier and the defendant?

IX.   Did the Trial Court err in permitting the prosecuting attorney to ask questions of certain witnesses regarding the habit of Angele Parmentier as to drinking, and regarding certain statements alleged to have been made by her?

X.   Did the Trial Court err in allowing in evidence certain statement by Angele Parmentier charging defendant with the killing of other persons?

XI.   Did the Trial Court err in permitting prosecuting attorney to ask of Eliza Cappaert, a witness for the defence, questions relating to her relations with her husband and to the contents of a certain letter written by her to her husband, Desire Cappaert, another witness for the defendant?

XII.   Did the Trial Court err in permitting the prosecuting attorney to ask of the defendant and Desire Cappaert questions in connection with certain alleged previous convictions?

XIII.   Did the Trial Court err in admitting in evidence certain photographs, trunks and their contents, and clothing belonging to Angele Parmentier?

XIV.   Did the Trial Court err in making certain remarks in the presence of the jury?

XV.   Did the Trial Court err in permitting the Attorney General to make certain statements in his argument to the jury?

XVI.   Did the Trial Court err in refusing to grant the defendant's motion for a new trial? ''

Some of these exceptions do not appear to demand specific discussion, and we shall therefore take up for consideration the more important questions which seem to require particular examination.

(1)    The defendant had been previously indicted on September 16, 1912, for the same offence.    To that indictment he pleaded not guilty on October 7, 1912, and was thereupon committed without bail by order of the Superior Court.    In April, 1913, the defendant petitioned this court for a writ of *habeas corpus,* setting forth in such petition that he was imprisoned and unjustly and unlawfully deprived of his personal liberty and held in custody in our State prison by the warden thereof, and that his detention in such prison was in violation of Section 17 of Chapter 354, General Laws of Rhode Island, 1909, which provides that '' Every person who shall be indicted for either of said crimes (including the crime of murder) and shall be imprisoned under the indictment shall be tried or bailed within six months next after the time at which he shall plead to such indictment, if he demand a trial, unless it shall appear to the court that some material witness in behalf of the State has been enticed away or is prevented from attending court by some unavoidable accident.''

Upon a hearing of this petition this court directed that a writ of *habeas corpus* issue.    The opinion of this court upon such petition is to be found *In re Henri Deslovers for Writ of Habeas Corpus,* 35 R. I. 248, and upon the petition for reargument 35 R. I. 256.

Following this opinion the original indictment was *nolle prossed* by the attorney general, and upon presentation of the case to another grand jury the present indictment was found under which the defendant was subsequently tried and convicted.    On May 8, 1913, the defendant filed a special plea in bar and motion for discharge, wherein he set. up the previous indictment and claimed that his release from imprisonment thereunder forever barred the State from further imprisoning or prosecuting him on account of the crime for which he was in said first indictment charged.    To this plea and motion the

attorney general demurred, and upon a hearing, in the
Superior Court, the demurrer to the plea was sustained
and the motion to discharge denied. To this decision of
the Superior Court the defendant took an exception, and
the correctness of such decision is now before us under
defendant's exceptions numbered 217 and 218.

In construing the statute under which the petition for
a writ of *habeas corpus* was brought, and in determining
its scope and bearing, we were necessarily led to consider
what effect a discharge from imprisonment would have
upon any future proceedings which might be instituted
looking to the finding of another indictment for the same
offence, and in our opinion, upon the motion for reargu-
ment, in order that any misunderstanding on this point
might be avoided, we felt constrained to say that "We
do not mean by ' discharge ' that the prisoner is to be
released from the consequences of the crime of which he
is accused, but simply that he cannot be further detained
in prison and deprived of his liberty under the present
indictment. In Section 16 of Chapter 305 of the General
Laws of 1909, relating to *habeas corpus,* it is provided
that ' If no legal cause be shown for the imprisonment
or restraint, the court shall discharge the party there-
from.' The language of this section would seem to ap-
ply to the case under consideration and that it was con-
templated thereby that in a case where the detention was
illegal the prisoner should be discharged from such im-
prisonment or restraint only. . . . As we have be-
fore said, Section 17 of Chapter 354 does not provide in
express terms for the discharge of the prisoner, nor does
it contain any language suggesting that a failure to try
him or bail him within six months should go any further
than to bring about his release from confinement."

A further examination now of the same question fails
to lead us to any different view from that expressed in
our opinion upon the motion for reargument. We can-
not assume, in the absence of any language to that effect,

that it was the intention of the General Assembly that a defendant should be discharged from imprisonment and consequently at the same time be exculpated from all the consequences of his crime. Besides, the contrary intent of the General Assembly is indicated in Section 28 of Chapter 305, which says: " No person who has been discharged upon a writ of *habeas corpus* shall be again imprisoned or restrained for the same cause, unless he shall be indicted therefor or convicted thereof . . . ". The defendant has cited some cases in support of his contention that a person once discharged under a writ of *habeas corpus* is immune from further prosecution for the same offence. While a decision in another jurisdiction may be of value its usefulness largely depends upon the similarity between the statute under which such decision is rendered and our own statute which is to be construed.

Our statute provides, Section 17, Chapter 354, that every person who shall be indicted and shall be imprisoned under the indictment shall be tried or bailed within six months next after the time at which he shall plead to such indictment, *&c.* This section makes no express provision nor does it contain any language from which any inference can be drawn as to the effect of such failure to try or bail within six months upon the subsequent status of the party indicted with reference to his further prosecution for the crime. This being so, we think it is reasonable to assume that it was intended that under such conditions a defendant should be left to his remedy by way of a writ of *habeas corpus,* and that is what the defendant in the present case resorted to.

Our statute further provides, Section 16, Chapter 305, that if upon a hearing upon a writ of *habeas corpus* " no legal cause be shown for the imprisonment or restraint, the court shall discharge the party therefrom." The word " therefrom " as thus used must be held to refer to " imprisonment or restraint." The language of the section, taken as a whole, fails to furnish a basis for any

reasonable inference that such a discharge was intended
to operate as an acquittal of the offence.  There seems
to be ample authority for holding that a discharge from
imprisonment, upon a *habeas corpus,* does not amount
to an acquittal of the crime unless it is expressly so pro-
vided by statute.   *State ex rel. Barbee* v. *Weatherspoon,*
88 N. C. 19; *State ex rel. Eldred v. Wright,* 2 Vt. 462;
*Walker et al.* v. *Martin,* 43 Ill. 508; *In re Begerow,* 136
Cal. 293.

We are further strengthened in our view, that a dis-
charge from imprisonment under a writ of *habeas corpus*
does not amount to an acquittal of the crime charged in
the indictment, by Section 28 of Chapter 305, which ex-
pressly provides that " No person who has been dis-
charged upon a writ of *habeas corpus* shall be again
imprisoned or restrained for the same cause, unless he
shall be indicted therefor," &c.

We do not find it necessary to enter upon a specific dis-
cussion of the authorities cited by the defendant upon
this point, as the particular statutory situation existing
in this State is not the same as in the other States from
which such authorities have been gathered.

The defendant, in discussing the view which we have
above expressed, says it would be possible for an attor-
ney general, unmindful of the duties of his high office, to
keep an accused in jail until he died through repeated
indictments every six months.  The case at bar does not
present that question, and we do not think that we would
be justified in seriously assuming that our view of the
matter would lead to such an abuse of legal process.  If
such a situation should arise perhaps further legislation
might be required, but with that we are not now con-
cerned.

We do not find any error in the decision of the Superior
Court sustaining the demurrer of the attorney general
to the defendant's special plea in bar and in denying the

defendant's motion for discharge, and his exceptions numbered 217 and 218 relating thereto must be overruled.

(2)     The defendant claims that the trial court erred in permitting certain witnesses, called by the prosecution, to give evidence concerning Angele Parmentier•and her relations with the defendant before it had been established, even *prima facie,* that the body found was that of the missing woman.   This testimony relates to the customs and habits of Angele Parmentier; her addiction to drink; her disposition and language when under the influence of liquor; her hostility toward the defendant as evidenced by words and accusations addressed to him during occasional quarrels; certain statements made by Angele Parmentier to others concerning the defendant and the names she called him, together with the manner and bearing which she exhibited in so doing, &c.

The objection of the defendant to this testimony is not that it was improper in itself, but that it was offered prematurely.   That it was offered before the *corpus delicti* had been established and was therefore inadmissible and improper.

Before the introduction of this testimony it had sufficiently appeared in evidence that a woman had come to her death through the criminal agency of some person, but it had not been established, at that stage of the case, either by direct or circumstantial evidence, that the decapitated body was that of Angele Parmentier, nor had any evidence been introduced tending to connect the defendant with the perpetration of the crime.   The defendant quotes as follows from 1 Wharton's Cr. Ev., § 325f: "As the burden of proof of the *corpus delicti* is always on the prosecution, the prosecution should not be allowed to proceed further, until the proof of death and its character is established, as far as the evidence can be separately given.   There is no reason for offering testi-

mony in reference to the commission of the crime by the accused, until there has been proof of the *corpus delicti.*"

This quotation, however, does not include the whole of the section. It continues in these words: " This is the general rule, and even confessions are not admissible until after proof of the *corpus delicti*. This order of proof ought always to prevail where the question of the *corpus delicti* is clearly separate and distinct from the question of the guilt of the party charged. But in many cases the two matters are so intimately connected that the proof of the *corpus delicti* and the guilty agency is shown at the same time; hence the order of proof in a criminal case is generally within the discretion of the trial court, and this prevails so generally that error committed in admitting testimony as to the guilt, before the proof of the *corpus delicti,* is cured, where the subsequent testimony sufficiently established the *corpus delicti.*"

In *Williams* v. *State,* 51 S. E. 322 (Ga.), the court said: " Counsel for defendant objected to the introduction of any evidence against the accused until the *corpus delicti* had first been proved by the State. There was no error in overruling this objection. The order in which evidence is allowed to be introduced must rest to a considerable extent in the sound discretion of the presiding judge. Sometimes the *corpus delicti* may be proved separately, and evidence tending to connect the accused with the offence produced afterward. In other cases proof of the *corpus delicti* and of the connection of the defendant with it is so interwoven as to be practically inseparable in the introduction of evidence. Thus, if a defendant were charged with murder by shooting another, it would be difficult to prove the homicide as an independent fact before showing that the defendant was the perpetrator. If the *corpus delicti* and the guilt of the defendant are both proved as the law requires, it will not furnish him any ground for complaint that the evidence did not separate

the case into two distinct parts, and refer to each separately.''

In *State* v. *Potter,* 52 Vt. 33, the court said: '' This expression, *corpus delicti,* figures largely in criminal trials from an early day, and yet, its precise scope, force, and application have not been, and cannot be, embodied in a proposition or rule applicable to all cases. The *idea* indicated by it is not obscure. Upon a charge of murder, the idea and the rule is that a conviction should not occur, unless it was proved that the subject of the alleged murder had lost his life. To put it short, that a person should not be convicted of having killed a person, until it was proved that that person was in fact dead. When that is established, the *corpus delicti* is made out — that is, the subject-matter of the alleged crime, namely, a person dead. I am not now speaking as to any character or amount of evidence required to establish that fact. So in relation to arson, larceny, or any other like crime, a burnt building, property gone from its owner, must be proved, before a person can be convicted of having committed the crime of arson, and the like. These facts being established, any evidence that tends to show that death, the burning, the loss of property, were the criminal act of the party charged, would be admissible. Often the evidence that tends to show the *corpus delicti,* as above manifested, tends also to show that it was effected by criminal means, and by the party charged. Such evidence would be admissible, notwithstanding, of itself, it would not be sufficient to establish the *corpus delicti.* If other evidence in the case, when supplemented by that, would show the *corpus delicti,* and the criminal act of the respondent in causing it, the utmost requirement of the law in this respect would be answered. In such case the order of introducing the evidence would not necessarily be the subject of error in law. Often it is a matter of preference with counsel, and discretion with the court.

When all in, then its legal application and force, as bearing on the subject of *corpus delicti,* may be challenged and tested, as well as on other elements of the crime charged against the respondent." See, also, *State* v. *Grear,* 29 Minn. 221; *People* v. *Besold,* 154 Cal. 363; *Carl* v. *State,* 125 Ala. 89.

We think that the order of proof, in the present case, rested in the discretion of the trial court. If there was any abuse of that discretion, operating to the prejudice of the defendant, it would become our duty to correct it. We do not find, however, that the order of proof sanctioned by the trial court was calculated to, or did, in fact, prejudice the defendant. Whether or not the later testimony in the case was sufficient to identify the body as that of Angele Parmentier and fix upon the defendant the perpetration of the crime are questions to which we may refer later in discussing the defendant's exception to the action of the trial court in denying his petition for a new trial.

(3)    The court permitted Emma Boell, a witness called in behalf of the State, to testify, against the objection of the defendant, as to the height and weight of Angele Parmentier, as compared with her own, for the evident purpose of identifying the body as that of Angele Parmentier, the witness at the time not being acquainted with her own height and weight. The defendant claims that these statements were nothing more than expressions of opinion on the part of the witness, who was not an expert, and were therefore inadmissible. The defendant cites several cases in support of his contention, among others *Forbes* v. *Howard,* 4 R. I. 364; *McGeary* v. *Old Colony R. R. Co.,* 21 R. I. 76, and *Flint Motor Car Co.* v. *Everson,* 34 R. I. 65. These cases are not helpful in determining the precise question raised. In *Forbes* v. *Howard* it was held that the members of a committee who had with the assistance of stage carpenters and artists fitted up a

theatre in New Bedford were not entitled to give their opinion as to the cost of fitting up a theatre in Providence. In *McGeary* v. *O. C. R. R.,* it was held that a witness could not testify whether he was "in position to hear" a signal if one had been given, as the question called for an opinion; that he could describe his position and the jury would determine whether it was one which would enable him to hear. In *Flint Motor Car Co.* v. *Everson,* it was held that the question propounded to the defendant, "How much do you consider is your loss in being deprived of the use of your automobile?" was properly excluded as calling for an opinion and not for facts. We cannot see that these cases in any way control or determine the present question. The witness Emma Boell had much more than a passing acquaintance with Angele Parmentier. She had known her for a considerable period, during which she had held frequent conversations with her. She had had many opportunities for clearly observing and becoming familiar with her build and contour and for comparing her size and weight with that of her own. She does not undertake to give an expert opinion, as, for instance, a doctor might do, but she simply points out to the jury, as facts, the differences which she has observed between Angele Parmentier and herself. We can see no good reason why this testimony should not have been admitted for what it was worth. Even if we should assume that it was a technical error to admit it, we could not say that it was of sufficient importance to have had any influence upon the minds of the

(4) jury, especially in view of the other testimony in the case bearing upon the question of identification. We think that the defendant's exceptions 29, 32, 33, 34, 35, 40, 41, 44, 45, 46, 47, 48, 49, 63, 64, 65, 66, 85, 90, 91, 92, 93, 94, and 95, covering the admission of the testimony of various witnesses regarding the relations of Angele Parmen-

tier with the defendant, and the testimony of Emma Boell which we have above discussed, must be overruled.

The defendant's exception 12 is to the refusal of the (5) court to allow the witness Dr. Myers to read the record of the autopsy which he made and which he read in the district court. The defendant's exception 14 is to the ruling of the court denying to defendant's counsel the right to examine the record of the autopsy made and kept by Dr. Myers. The defendant's exception 16 is to the ruling of the court denying his right to inquire whether the autopsy made upon the body of Angele Parmentier was the last entry in Dr. Myers'/book.

We cannot see the importance of exception 16. The defendant claimed that he was entitled to show whether or not the entries in the book were kept in regular order. The question, which was ruled out, simply calls upon the witness to state whether or not the record of the autopsy upon the body of Angele Parmentier was the last entry in the book. We find nothing in the case tending to show the materiality of the question nor can we discover any advantage which could accrue to the defendant by showing that the record in question was the final entry in the book.

We will now proceed to discuss the other exceptions 12 and 14.

On the 25th of June, 1912, Dr. Myers was called upon to make an autopsy on the body of a woman, claimed to be that of Angele Parmentier, in which autopsy he was assisted by Dr. Robert G. Read, a medical examiner for the district in which the body was found. During his examination of the body, Dr. Myers verbally communicated to Dr. Read from time to time the results of such examination, which the latter noted in a book used for that purpose. Later Dr. Myers copied these notes and made therefrom a record for his own use. On the witness stand and in cross-examination, Dr. Myers admitted

that he had such record and expressed his willingness to read the same in presence of the jury. The record, however, was not read, and no request for such reading was made by the defendant at that time. The counsel for the defendant then asked to see the record. The doctor refused on the ground that it was his private property until it was surrendered by him to the State House, which he would do when the book was filled, and that he did not deem it wise to produce it for inspection although he had made use of such record in giving his testimony in the district court. Dr. Myers further testifying said that he had made use of such record to refresh his memory, and had used it for that purpose that very morning. It appears also from the testimony of Dr. Myers that when these books become filled they are returned to the State House and placed on file there, a new book being issued in place thereof. Further on, during the examination of this witness, counsel for defendant, again being refused by the witness the privilege of examining this record, appealed to the court and was granted the opportunity of looking at the book, such inspection, however, being expressly limited to seeing whether or not such record contained three or four certain specific words. This occurred in the morning session. In the afternoon defendant's counsel requested that he might be allowed to examine the book further, which request was denied by the court.

The mere fact that the witness did not have the record immediately before him when he gave his testimony upon the stand does not seem to us to be material in view of the further fact that he had a very short time previously refreshed his recollection by its examination, such examination being made in contemplation of the evidence which he was about to give. Under such conditions he must be said to have obtained substantially the same assistance from the record which he would have obtained

from its perusal during his examination. In 1 Wigmore on Evidence, § 762, in discussing the rule to be applied in such cases, the author says it "should apply, moreover, to a memorandum *consulted* for refreshment *before trial* and not brought by the witness into court; for, though there is no objection to a memory being thus stimulated, yet the risk of imposition and the need of safeguard is just as great. It is simple and feasible enough for the court to require that the paper be sent for and exhibited before the end of the trial." See, also, *People* v. *Vann,* 129 Cal. 118; *White* v. *Allen,* 3 Ore. 103, 110; *Hamilton* v. *Rice,* 15 Tex. 382, 386.

(6)   It further appears in the testimony of this witness that upon having read to him certain portions of his testimony, given in the district court, and being inquired of as to whether or not he had made such statements, he consulted this record in making his answers. We think that this was a use of the record which would entitle the defendant to see and have the benefit of it in further cross-examination.

We think that the refusal of the court to permit counsel to examine this record was error. As stated in 1 Wigmore, § 762, *supra,* "On a general principle, having in view the risk of imposition and false aids, against which the opponent is entitled to the means of protection, the writing must be shown to him on request. Furthermore, as by having an opportunity of inspection the opponent is guarded against imposition clearly apparent, so by cross-examination based on the paper he may further detect circumstances not appearing on the surface, and exhibited before the end of the trial." See, also, testimony."

In the present case the defendant should have been permitted to show to the jury, if he could, that the statements of the witness were inconsistent with the earlier memorandum or record from which he claimed to have

refreshed his memory. This he could not do unless he could see the record itself. This question seems to be well settled by authority. There are some decisions to the contrary, but as Wigmore says in the section before referred to, they " are in a small minority, and have no principle to support them." In *Hardy's Trial,* 24 How. St. Tr. 824 (1794), Eyre, L. C. J., says: " It is always usual and very reasonable, when a witness speaks from memorandums that the counsel should have an opportunity of looking at those memorandums, when he is cross-examining that witness." In *Rex* v. *Ramsden,* 2 C. & P. 603 (1827), the witness gave a date as six months before; when the counsel put a paper in his hand, he then named the date as nine months before; the opposing counsel demanded to see it. His right to see it was objected to. Tenterden, L. C. J., said: " You put the paper into the witness' hands to refresh his memory. It is very usual for the opposite counsel to see it and examine upon it, and I think he has a right to see it." In *Lord* v. *Colvin,* 2 Drewr. 205 (1854), Kindersley, V. C., said: " If a paper is put into the hands of a witness to refresh his memory, if after that nothing comes of it, if nothing more be done, then the other party has no right to look at it. But if anything further is done, if the witness is asked and answers questions about the document or the facts referred to in it, then at law the party on the other side had the right to see the document." In *Duncan* v. *Seeley,* 34 Mich. 369 (1876), Cooley, C. J., said: " The other party had a right to know what the memorandum was on which he relied, and whether it had any legitimate tendency to bring the fact in controversy to mind. It would be a dangerous doctrine which would permit a witness to testify from secret memoranda in the way which was permitted here. . . . The defendant was entitled to see it at the time in order to test the candor and integrity of the witness." See, also, *Hall* v. *Ray,* 18 N. H. 126.

The defendant also claims to be entitled to the examination of this record on the ground that it is a public document, the witness, as medical examiner, receiving the book from the State and when filled returning it to the State to be kept on file. Inasmuch as it appears from the testimony that this record had been placed by the witness in the hands of the attorney general, who had had ample opportunity to examine and gather from it any benefit .which it might afford, we can see no reason why (7) it should not have been also available to defendant for examination. It is not necessary, however, to discuss this point, having found sufficient error before reaching it. If the defendant is entitled to an inspection of .this record it would not add anything to his opportunities for defense to grant him the privilege of examination upon some ground other than that which we have already discussed. The witness expressed his willingness to read his record of the autopsy, which he had read in the district court, but later, when the reading was requested by the defendant, such request was denied by the court. We think that such ruling, as well as the refusal of the court to permit defendant's counsel to see. the record, constituted reversible.error, and that the defendant's exceptions 12 and 14 must be sustained.

(8)   The defendant further claims that the trial court erred in permitting the prosecuting attorney, in the cross-examination of a witness, Eliza Cappaert, to inquire into the contents of a letter written by her to her husband Désiré Cappaert.

Eliza Cappaert and her husband arrived at Woonsocket in January, 1912. She had been acquainted with Angele Parmentier in France before coming to this country. Upon the arrival of the Cappaerts in Woonsocket they boarded for some six weeks with the defendant and Angele Parmentier, who were then living together as man and wife, afterwards hiring a tenement for

themselves. At another time the defendant and Angele boarded with the Cappaerts for a while, but they had again taken a tenement of their own prior to the disappearance of Angele. The acquaintance between these people seems to have been of a somewhat intimate character, and their intimacy continued down to the time when Angele disappeared, and about the time of her disappearance the defendant visited the home of the Cappaerts to get his fish pole, which, together with his gun, he seems to have kept at the Cappaerts after he and Angele had ceased to board with them.

The defendant was arrested on June 30, 1912, charged with the killing of Angele Parmentier, and after a preliminary hearing in the district court was bound over to the grand jury and committed to jail to await its action. Désiré Cappaert visited the defendant several times at the jail. Some time in July, the exact date does not appear, Désiré Cappaert left Woonsocket and went to Lawrence, Massachusetts, so that he could, as it is claimed, learn to weave, this opportunity not being open to him in Woonsocket. The wife, Eliza, remained in Woonsocket three weeks after the departure of her husband. It was during this period of three weeks that Eliza Cappaert wrote the letter to her husband which is the subject of defendant's exceptions 173, 174, 175, 176, 177, 178, 179, 181, 182, 183, 184, 185. The manner in which the letter came into the possession of the prosecuting attorney does not appear, nor does such letter as a whole appear in the record. It does appear in evidence, however, that the letter contained the expression, " Up to the present time no one says anything but it is best to use precaution," referring to the case of the defendant. It was the cross-examination of the defendant's witness Eliza Cappaert upon this part of the letter that led to the above twelve exceptions of the defendant. The defendant claims that all of these cross-interrogatories

and the answers thereto are objectionable for nine reasons which he sets forth in his brief. (1) Because it tended to criminate the husband of the witness. (2) Because it tended to disclose marital communications. (3) Because it tended to show confederacy or conspiracy between the husband of the witness and the defendant, a matter not alleged in the indictment. The remaining six reasons need not, in our present view of the case, be specifically considered, as we think they will be disposed of in the discussion of the three reasons above mentioned.

The husband of the witness was not a party defendant nor was he charged with the commission of any crime. The intimate relations which were shown to have existed between the Cappaerts on the one side and Deslovers and his mistress on the other would naturally lead the prosecuting officer to closely examine Eliza Cappaert with a view to showing a degree of interest in the defendant which might, in the minds of the jury, affect her credibility. Eliza Cappaert was probably aware that these intimate relations were known to others, and she might naturally feel that she and her husband, although innocent of any participation in the crime, might be suspected of having had some connection with it. The language of the letter is capable of more than the single interpretation that it refers to some knowledge of, or some participation in, the crime. It may be equally, and we think more reasonably interpreted to mean, in view of there being no testimony that the Cappaerts were in any way connected with the crime, that no one had said anything about their connection with it, and that they had better guard their speech and behavior so as not to create or promote such a suspicion. The evident purpose of the cross-examination of this witness was to show interest and affect her credibility, not that interest which would come through a participation of her husband in the crime, but that interest which might reasonably and perhaps

naturally result from the friendly relations which, from their own testimony, existed between them.

So far as criminating the husband of the witness or showing a confederacy between him and the defendant is concerned, we cannot see any force in the defendant's exceptions on those grounds.

There is, however, the further question whether or not this testimony should have been excluded as a confidential and privileged communication between husband and wife.

Many authorities hold that whenever such a communication passes from the possession of the immediate parties or the contents thereof become known to others, the element of privacy, which is the basis of the privilege, disappears and practically ceases to exist, no matter by what means the possession or knowledge by others may be obtained. Other authorities support the contrary view, that where the communication between husband and wife in the first instance comes within the privilege rule it retains its privileged character although it may find its way into other hands.

We do not think it necessary to enter upon a discussion of these conflicting authorities inasmuch as the law upon the subject appears to have been settled by prior decisions of our own court. We must bear in mind that the husband of the witness Eliza Cappaert was not on trial, nor had he been accused of any complicity in the crime with which the defendant was charged, and that the only apparent purpose of the prosecution in its cross-examination, regarding the letter in question, was to show the interest of the witness affecting her credibility. We think we might well end the discussion of this point with the words of Judge Durfee in *State* v. *Briggs,* 9 R. I. 361: "If we accord to the witness the privilege of objecting to testify on the ground that the testimony, if given, will criminate, or tend to criminate, a husband or wife, we think that, in a proceeding which can never be used

against the husband or wife, there is no sound principle of public policy which requires that we should go still further, and put it in the power of a third person, by objecting when the witness does not object, to defeat, it may be, a just claim, or escape a merited punishment.''

We will go further, however, and briefly refer to the case of *State* v. *Kenyon,* 18 R. I. 217, in which this court held that under our statute the husband or wife of the accused offering himself or herself as a witness cannot be excused from testifying because of the relationship to the respondent, that the witness must testify as though the relationship did not exist, and that for the purpose of eliciting testimony the statute ignores the fact of marriage for the time being. This goes further than the exigencies of the present case require. We think that the defendant's exceptions 173, 174, 175, 176, 177, 178, 179, 181, 182, 183, 184, 185, must be overruled.

The defendant's exceptions 119, 128, and 190 are to the (9) ruling of the court denying the defendant's request that the interpreter be instructed to translate the whole of certain answers given by the witnesses.

It appears from the record that in at least three instances the court ruled upon the admissibility of the witness' answers without having the entire answer translated.

The general rule is that '' it is the duty of an interpreter to interpret and repeat to the court every statement made by the witness whose evidence he interprets, and he has no discretion or power to determine what is admissible and what not admissible, or to omit to interpret what he considers hearsay. His power is ministerial only.'' 7 Encyc. of Ev., 658. The interpreter cannot be charged with the duty of determining whether or not the answer of the witness is hearsay. *People* v. *Wong Ah Bang,* 65 Cal. 305. In the case of *Tavares* v. *Dewing,* 33 R. I. 424, this court said: '' It is the function

of an interpreter to interpret correctly all questions and · the answers thereto, and the power to determine whether answers given by the witness are responsive belongs to the court, and must be exercised by it, and cannot be delegated to the interpreter.''

It may be argued that in the case at bar enough of the answer of the witness was translated to show the court its hearsay character and therefore it was not error to rule out the further translation. While such action on the part of the court might not be prejudicial to the defendant, in some individual instance, the danger of such a practice is quite apparent. It does not necessarily follow that if the first part of the answer is hearsay or irresponsive, the remainder is of the same character. It seems to us that the only safe method is for the interpreter to translate everything which the witness says, leaving the trial judge to determine what portion thereof shall be eliminated from the record when the whole is before him. Even hearsay evidence is not always to be excluded. For instance, it may sometimes be required to show the basis of some action on the part of the witness although it may be without any probative force.

(10) In the present case the defendant, in the course of his testimony, is asked if he is familiar with the handwriting of Francois Eckhaut, and he answers, '' Yes. Those were the fourth—.'' Counsel for defendant requested that the translation of the answer might be completed so that its admissibility might be passed upon by the court. The request was refused. We think such refusal was error, but it was not prejudicial to the defendant in view of the fact that upon an almost immediate repetition of substantially the same question, the witness repeated his answer, which was fully translated as, '' Yes, this was the fourth time that he wrote to me,'' and it so stands as a part of the record. We therefore think that the defendant's exception 128 must be overruled. Later on the defendant,

having been recalled, is interrogated by his counsel as follows: " Q. How many notes did you receive from Francois Eckhaut while you were in jail? A. Three. Q. I present you defendant's exhibit B. and ask you whether those two slips of paper were received at one time or at different times? A. Those were rolled up together, with thread — that or twine around it. (Interpreter, ' fil ' is what is commonly known as thread.) This the last one that he brought. The first and second that I received. I tore them and throwed them away, because he said in those notes —." The court denied the request of the defendant's counsel that the rest of the answer be translated.

Again the defendant was asked, " Q. Why did Octavie Courtens leave your house after she had been there two days, if you know? A. Because it is I that made her go away. Q. Why did you make her go away? A. On Monday her husband, he stopped me at the Social —." Further on the witness answers when the question is repeated, " I told Octavie Courtens she had to go away because her husband would have us arrested that night. Courtens told me that —." The further translation of this answer was refused by the court, saying the witness, having answered the question and proceeding to attempt to state a conversation which was not responsive to the question, the remainder of his answer will not be translated.

During the testimony of Désiré Cappaert he was asked, " Q. What was Henri doing there, do you know? A. I am not certain whether I saw him on Tuesday, but as my wife explained to me —." The court refused to permit the translation of the remainder of the answer.

(11)    While the translated portions of these answers point to their inadmissibility, and suggest that the remainder was also founded upon hearsay or was not responsive, we think it would be going too far for the court to act upon

8

such assumption without actually knowing all that the witness had said. Besides, the propriety of the answer may be a matter of argument and may present some question for the consideration of the court. If the answer is not translated the defendant is consequently deprived of all opportunity to discuss its admissibility. It is not necessary that such translation should, in the first instance, be made in the hearing of the jury. The court can obtain the translation for its own benefit and can hear counsel in reference thereto, aside from the jury, and can then with full knowledge decide what part, if any, should be submitted to the jury and go upon the record. While we think that the refusal of the court to obtain the full translation of the answers of a witness before ruling upon them would be error, we do not think that the error was harmful to the defendant under the conditions of the present case.

At least one of the counsel for the defendant was well versed in both the language of the witness and of the court, and if the untranslated portion of the answer contained anything admissible it could have been readily brought out by further questions. The defendant does not claim that the parts of the answers which were not translated contained anything admissible. He only asserts his naked right to have the whole translated. We think that in the case now before us the rulings of the court were not harmful to the defendant and that his exceptions 119, 128, and 190 must accordingly be overruled.

The defendant's exceptions 42, 52, 58, 96, 117, and 196 were taken to the error of the court, as the defendant expresses it in his brief, in imposing upon the defendant Andre Blanchard as interpreter for certain witnesses for both the State and the defendant.

(12)    There does not appear to have been any objection, on the part of the defendant, to the appointment of Mr.

Blanchard in the first instance. The exceptions relate to the refusal of the court, from time to time, to appoint another interpreter when, as the defendant claims, it appeared that Mr. Blanchard was incompetent and not equal to the task imposed upon him.

It must be conceded that in the selection, appointment, and retention of an interpreter, as well as the manner of conducting an examination through him, the trial court is vested with a large discretion, and that the exercise of such a discretion will not be interfered with unless an injustice to the complaining party clearly appears. 7 Encyc. Ev., 653; *Skaggs* v. *State*, 108 Ind. 53.

Mr. Blanchard, during the trial of this case, interpreted the testimony of some twenty-two witnesses, many of whom were examined at great length. It would be unreasonable to expect that during such an extended interpretation no question as to its correctness would arise. The objections to Mr. Blanchard were not, however, occasional, but were frequent and numerous.

It does not seem necessary or desirable to enter upon a particular discussion of each instance in which the ability of the interpreter was called in question during the trial. An examination of the record shows the interpreter as being unable to think of the desired word; as not knowing the proper word; as adding something to answers; as leaving out parts of answers through forgetfulness; and from time to time adopting material corrections of the counsel for the defendant after he had translated the answer of the witness. While there is no doubt in our minds that the interpreter was doing the best he could, we think that the record clearly shows that he was incompetent and unable to discharge his duties in a manner calculated to insure to the defendant a fair trial. We think that when the incompetency of the interpreter became apparent it became the duty of the trial court to appoint some one else who was better versed in the languages

which it was necessary to have interpreted, and the failure to do so must have been prejudicial to the defendant. It may be argued that it was the right of the defendant, if he saw fit, to show the imperfections or errors of the translations by the use of witnesses expert in the language under interpretation, and that the correctness of the translation would then become a question of fact for the jury. Assuming that the defendant would have such a right, we do not think that it would be sufficient to excuse or modify the error. Besides it would be undesirable to thus largely increase the number of facts with which the jury in such a case must necessarily deal. The defendant's exceptions 42, 52, 58, 96, 117, and 196 must be sustained.

The defendant's exceptions 108 and 202 relate to certain remarks of the trial justice made during the progress of the trial and in the presence of the jury. The defendant took a number of exceptions to remarks of the court which, it is claimed, reflected upon his counsel and which, in one instance, was complimentary to one of the witnesses and amounted to an expression of confidence in her credibility. The defendant has, both in his brief and in his argument, presented to us all of these exceptions for our consideration. When we come to examine his bill of exceptions we find that only two remarks of the court are therein referred to. At one time the State, having objected to a question by counsel, and defendant's counsel having asked that he might be heard, the court said, " We cannot waste time that way." At another time, the defendant's counsel having requested the court to instruct the witness to make her answers responsive, the court said, " I believe that the witness is trying to do the best she can." We think that we must confine ourselves to the consideration of the two exceptions above mentioned, they being the only ones to be found in the bill of exceptions relating to the utterances of the court.

Courts have been very careful in eliminating any remarks by the trial judge the tendency of which would be to intimate to the jury his personal view, would amount to criticism of counsel, or be complimentary to a witness by way of expressing confidence in his or her credibility.

In *Peeples* v. *State*, 103 Ga. 629, where the trial judge alluded to the efforts of counsel to introduce certain testimony as being unnecessary because they consumed time, " in taking wild-goose chases all over the country," the court said, " There was no occasion for making remarks of this kind, and their effect upon the prisoner's case could not have been otherwise than harmful." *Abe House* v. *State*, 42 Tex. Crim. Rep's 125, it was held that the court should not indulge in reflections upon counsel when passing upon questions of evidence, and that to do so was reversible error. In *Kirk* v. *Territory of Oklahoma*, 10 Okl. 46, where the trial court said to counsel for defendant, " Do not quarrel with witness," it was held to be a reflection on the counsel for the defendant and an express disapproval of his conduct.

It has also been held that any remark on the part of the trial court complimentary to the witness is reversible error. *Pound* v. *State*, 43 Ga. 88; *State* v. *Staley*, 45 W. Va. 792; *Kirk* v. *Territory of Oklahoma*, 10 Okl. 46. We think the defendant's exceptions 108 and 202 to the remarks of the court must be sustained.

(15)    The defendant's exception 219 is to the denial of his motion for a new trial. This motion is based upon six grounds: " 1st. That the verdict is against the evidence. 2nd. That the verdict is against the evidence and the weight thereof. 3rd. That the verdict is against the law. 4th. That the defendant has discovered new and material evidence which could not, by reasonable diligence on his part, have been discovered in time to have been produced at the trial of the said case. 5th. That the jury in the said case had in the jury room and examined in their

deliberations exhibits, or articles, which had not been admitted in this case.    6th. That the interpreter in the said case was incompetent, there being a large number of witnesses who spoke only the French language, which language was interpreted by Andre J. Blanchard, and the evidence, as given by the witnesses, was not the evidence given by the interpreter to the jury, nor were the questions asked of the witnesses the same literally or in their meaning, as those given by the interpreter to the witnesses.''

.    The evidence both as to the *corpus delicti* and as to the perpetration of the crime by the defendant is largely, if not wholly, circumstantial, but under the authorities we must hold that both may be shown by circumstantial evidence, if such evidence is sufficient to support the verdict of the jury.    A concise statement of the law upon these points may be found in *Com.* v. *Williams,* 171 Mass. 461, in which Mr. Justice Holmes said: '' Evidence which is colorless, taken by itself, which establishes neither a constituent nor a fact pointing by inference to a constituent of a crime, may be made significant by other evidence, and so may be made admissible.    It need not be self-justifying without regard to the other circumstances proved.    *Commonwealth* v. *O'Neil,* 169 Mass. 394.    What is true of any part of the evidence is true with regard to the whole of it.    And it also is true, in this Commonwealth at least, that there is no one dominant part of the case which must be proved as directly as possible in the nature of things before evidence of a remoter kind is admissible to connect the defendant with the supposed crime.    No doubt the jury ought to be very sure that a crime has been committed before they convict a person of having committed it.    But even upon an indictment for murder, the evidence of the death as well as of every other material fact may be insufficient singly, and yet the evidence taken as a whole may leave no reasonable doubt

of the crime or of the defendant's guilt. The facts in a circle support one another, when if any one were withdrawn they all would fall to the ground.'' Many other cases support the general proposition that circumstantial evidence is sufficient, among which we may cite, *United States* v. *Gibert,* 2 Sumner, 19; *State* v. *Smith,* 9 Wash. 341; *McCulloch* v. *State,* 48 Ind. 109; *State* v. *Ah Chuey,* 14 Nev. 79; *Gray* v. *Com.,* 101 Pa. 380; *Lancaster* v. *State,* 91 Tenn. 267; *Paulson* v. *State,* 118 Wis. 89; *Campbell* v. *The People,* 159 Ill. 9; *State* v. *Dickson,* 78 Mo. 438.

We think that the evidence as to the *corpus delicti* and the guilt of the defendant, although circumstantial, was sufficient to support the verdict of the jury and that there was no error in denying his motion for a new trial on the first five grounds set forth in his petition. The sixth ground in the motion for a new trial relates to the incompetence of the interpreter, which is the subject of other specific exceptions now before us which we have been obliged to sustain. Such a question cannot be properly included in the motion for a new trial. We think that exception 219 must be overruled, leaving the matter of the interpreter as considered under the other exceptions relating to that subject.

While a defendant, accused of a crime, is always entitled to a fair and impartial trial it would seem that in a case of this kind, where some of the witnesses were of uncertain character and the testimony was circumstantial, the greatest care should be exercised in securing to the defendant a trial which should be scrupulously fair and impartial and in which everything likely to prejudice his case in the minds of the jurors should be eliminated; that all questions of law should be properly decided and that all questions resting in the discretion of the court should be reasonably disposed of. As the court said in *People* v. *Wolf,* 183 N. Y. 464: '' However strong the evidence against the defendant may be, if she did not

have a fair trial, . . . the judgment of conviction should be reversed and a new trial ordered so that she may be tried according to law.'' The defendant has been convicted of an atrocious and barbarous crime. If he is guilty he should suffer the punishment which the law prescribes. It is not for us to pass upon his guilt or innocence, but only to determine whether or not, under all the circumstances of the case, he has had that fair and impartial trial to which under the law he was clearly entitled. We cannot say that he has had such a trial.

It is readily observable from the record that the trial was conducted with more or less personal feeling between counsel. Adding to this the incompetence of the interpreter and the frequent and somewhat acrimonious contests over him, it is not perhaps surprising that the trial judge should have become wearied, his patience exhausted, and that he should have been led into objectionable observations and remarks. Without attributing any blame to counsel or court, we cannot but feel that all of these things combined to create an atmosphere surrounding the trial which was unfortunate and which must have been prejudicial to the defendant.

The defendant's exceptions 12, 14, 42, 52, 108, 117, 196, and 202 are sustained. All the other exceptions of the defendant are overruled and the case is remitted to the Superior Court with directions to give the defendant a new trial.

SWEETLAND, J., dissents.

*Herbert A. Rice,* Attorney-General.
*Antonio A. Capotosto,* Assistant Attorney-General.
*Zechariah Chafee, Jr.,* of counsel for State.
*Eugene L. Jalbert, John J. Fitzgerald,* for defendant.