### THE POCHASSET.

(District Court, D. Rhode Island. June 9, 1922.)

No. 1384.

1. **Seamen** ⊙⟞29(2)—**Not entitled to compensatory damages for negligent injury.**
   A seaman is not entitled to recover compensatory damages for injury by falling through an open hatchway in the dark, above the expense of maintenance and cure and wages for the voyage, though the hatchway was unlighted, where facilities for protecting and lighting it were provided by the owners.

2. **Seamen** ⊙⟞29(5)—**Ship held not chargeable with improper treatment of injured seaman.**
   Charges that a vessel did not give a seaman with a broken leg prompt and proper care, and that it was responsible for nonsuccess of his treatment in hospital, which left him permanently disabled, *held* not sustained by the evidence.

In Admiralty. Suit by Alexander Mansen against the schooner Pochasset for personal injury. Decree for expense of maintenance and treatment and wages.

Silas Blake Axtell, of New York City, and Aylsworth Brown, of Providence, R. I., for libelant.

Alexander L. Churchill and Frank Healy, both of Providence, R. I., for claimants.

BROWN, District Judge. This is a libel in rem, for personal injuries to Mansen, one of the crew, who fell through an open hatch while the schooner Pochasset, 112 feet long, was bound up the Hudson river to Albany, as part of a tow of 2 schooners and 26 barges. The Pochasset was about 750 feet from the towboat.

---

⊙⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Mansen was shipped as cook, about 5 p. m., July 1, 1914, while the Pochasset was in the stream, and went aboard with the captain about 7 or 8 o'clock p. m. He turned in about 9.

He testified that he rose about 4 o'clock to go forward to the galley, and struck his foot against something hard, and fell into the forward hatch.

It is contended that the vessel was unseaworthy, in that the deck was worn and patched with a board, or a cleat, nailed to the deck in front of the water barrel on the starboard side of the galley, and that Mansen struck his foot on it and was thus caused to fall into the hold. Mansen's testimony affords no support to this contention, but contradicts it; and the photographs in evidence show that, in order to strike his foot against one of the cleats, he must have gone several feet beyond the hatch, and that, if he had fallen for that reason, he would have fallen either against the water barrel or the side of the galley, and not into the hold.

The evidence is wholly insufficient to show that the accident was due to any defect or unseaworthiness of the vessel.

While every allowance should be made for Mansen's peculiarities and for his defective memory, we cannot disregard his statement as to the place where he located himself by marks on the photograph. He testified to being in a space or alley between the galley and the forward side of the hatch. There is no passageway at this point. If at this place he was either attempting to cross on the hatch coaming next the galley, or struck his foot on the port side of the coaming, mistakenly assuming that there was passage room between the galley and the hatch.

He testified, also, that he was told on the previous evening that the hatch covers were off.

[1] That the hatch covers were off and the hatchway unlighted, the vessel being sufficiently provided with lanterns and oil, and lines and stakes, for use when needed, does not justify an award of compensatory damages beyond the admitted liability for the expense of cure, maintenance, and wages for the voyage. The Osceola, 189 U. S. 158, 23 Sup. Ct. 483, 47 L. Ed. 760; Chelentis v. Luckenbach S. S. Co., 247 U. S. 372, 38 Sup. Ct. 501, 62 L. Ed. 1171; Hanrahan v. Pacific Transport Co. (C. C. A.) 262 Fed. 951; The Santa Barbara (C. C. A.) 263 Fed. 369; Campbell v. Trinidad S. Co. (D. C.) 165 Fed. 270; The City of Alexandria (D. C.) 17 Fed. 390, 392; In re Tonawanda Iron & Steel Co. (D. C.) 234 Fed. 198.

As the accident occurred on July 2, 1914, before the passage of the Seamen's Act, so called, on March 4, 1915 (38 Stats. 1164), the present case is governed by the ordinary maritime law, and is not affected by that statute.

[2] It is also charged that the ship did not perform her duty to furnish proper care and assistance to Mansen after the accident.

Upon the discovery that Mansen had fallen into the fore hold, some time was spent in rigging a tarpaulin with ropes, placing Mansen upon it, and hoisting him to the deck. This was accomplished about 7 o'clock. He was then taken aft and put in the captain's bunk, where

the captain did what he could to make him comfortable. The captain then set his flag to signal the towboat, and tried repeatedly to hail the tug by megaphone, but did not succeed. The tow was then proceeding very slowly against an ebb tide.

Capt. Conway of the tug George Field, bound down the river, saw the Pochasset's flag and went alongside, between 2 and 3 o'clock. Mansen was lowered from the schooner to the tug and taken to Newburg; Capt. Thomassen, of the Pochasset, going with him in the tug. Mansen stayed on the tug until the arrival of an ambulance from St. Luke's Hospital and was removed from the tug to the hospital between 3 and 4 o'clock; the captain of the Pochasset accompanying him to the hospital.

An examination disclosed a fractured femur. The ordinary treatment was applied, but for some reason recovery was retarded, the wound became infected, and operations were necessary. Mansen remained at St. Luke's Hospital from July 2, 1914, until June 7, 1915, when he was discharged, though not cured. In August, 1915, he went to Sailors' Snug Harbor, a charitable institution, where he is now staying.

His leg is much shortened and is badly bowed. His wound is still discharging pus, after the lapse of about eight years. That he is permanently incapacitated for his former work as seaman or ship's cook, and must continue to require the aid of charity, seems probable.

While there is complaint of slowness in getting Mansen to shore and to the hospital, it is apparent that in the ordinary case of a broken leg the difference between the time of actual arrival at the hospital and an arrival a few hours earlier would not affect the union of the bones. Medical testimony to this effect seems reliable and reasonable.

It is claimed, however, that during the hours of alleged delay the master of the Pochasset was negligent in permitting Mansen to drink an excessive amount of whisky, which caused him to thrash about, so disturbing his leg that it became impossible to effect a cure.

That as matter of fact Mansen, before getting to the hospital, did so behave as to aggravate the injury and prevent a union, there is no evidence. On the other hand, there is much evidence that while at the hospital he was an unruly and difficult patient, who, by cutting his bandages and removing the weights, did retard his own recovery.

Mansen testified that a man on a barge alongside gave him a drink of whisky, and that the captain stood alongside. There is no evidence that the captain of the Pochasset gave him whisky, and the captain denies that he did, or that he saw whisky given to him. Capt. Conway, of the tug which took Mansen to Newburg, testifies that Mansen did not appear intoxicated. Dr. Theron Smith, of St. Luke's Hospital, who went with the ambulance to the tug and prepared Mansen for removal to the hospital, by applying an emergency dressing, and was with him an hour and a half, testified:

"I am not going to say the man was drunk, because I don't know; but nevertheless he had an odor of some liquor on his breath," etc.

"He was able to answer questions; he was not in an unconscious state, nor a semiconscious state."

There is a discrepancy between the testimony of these witnesses and the testimony of Dr. Townsend, who said that the man was "staving, loaded drunk," and "drunk as an owl when he came in."

I am unable to agree with what seems to me a somewhat far-fetched inference that the permanency of Mansen's injuries is due to an excessive amount of whisky taken after the accident.

Upon the whole case, I am of the opinion that the only liability is for the cure, maintenance, and wages. The extent of the obligation of the ship for the cure of the mariner of sickness and wounds received in the service of the ship is considered in the City of Alexandria (D. C.) 17 Fed. 390, 393, 394; The Osceola, 189 U. S. 158, 23 Sup. Ct. 483, 47 L. Ed. 760; Barrett v. Macomber & Nickerson Co. (D. C.) 253 Fed. 205; The Bouker No. 2, 241 Fed. 831, 154 C. C. A. 533.

The claimant concedes its liability—

To St. Luke's Hospital ............................................$519.00
To. Dr. C. E. Townsend ........................................... 50.00
And to wages to end of voyage ................................... 50.00

In all ...........................................................$619.00

—but denies all liability for compensatory damages.

I am of the opinion that the vessel can discharge its obligation to the libelant by payment of these sums.

A draft decree may be presented accordingly.