44 F.Supp. 809 (1942)
THE ALPHA.
FINLEY
v.
DALY TANKSHIP CORPORATION et al.
No. 5.
District Court, E. D. Pennsylvania.
April 28, 1942.
*810 Abraham E. Freedman and Freedman & Goldstein, all of Philadelphia, Pa., for libellant.
John Breck Shaw and Krusen, Evans & Shaw, all of Philadelphia, Pa., for respondents.
LEAHY, District Judge.
I. On the evening of November 12, 1939, the steamship Alpha was proceeding to the port of Houston, Texas. The libellant[1] had just finished his watch from 4 to 8 p. m. With his watch partner, Clark,[2] he proceeded aft to the messroom *811 and his quarters, which were located under the poop deck at the extreme aft end of the vessel. Preceding Clark, libellant descended the stairway from the poop deck. When part way down  according to the story of libellant and Clark  one of the metal treads of the stairway broke, causing libellant to fall the remaining distance in a sitting position with his right leg twisted beneath him. Clark assisted him to the messroom where he complained that his right leg was injured.[3]
He did not report the injury or the defect in the stairway to any officer of the ship until the next day. The ship arrived in port, but Finley did not go ashore for treatment. He testified that he received no medical treatment from the officers of the ship, and was furnished no medical supplies. But the Captain testified that he visited libellant the day after the accident occurred; that he noticed Finley's right knee was swollen; and that he, himself, applied hot packs to the injured knee. The Captain further testified that he examined the injured leg periodically throughout the entire voyage.
It appears that Finley did sustain some form of injury. Clark, Captain Kehoe and Chief Mate Tweekrem all testified that libellant's right knee was swollen. The testimony of the Second Mate Deal that there was "no evidence of swelling or bruises" and that the knee "appeared perfectly normal" is inexplicable in the light of the testimony of his fellow officers. In any event, I think it fair to state that respondents have impliedly admitted the fact of injury; their challenge is to the extent of injury and to the existence of a violation of any duty to libellant.
By negative testimony, respondents deny the right to indemnity by attempting to show that the accident occurred in some manner other than as related by libellant. They do not show under what circumstances the injury did in fact occur. But they do show that Finley related to the Captain and the Chief and Second Mate inconsistent stories of the manner and place on the ship where the accident happened.[4] However Clark is the only percipient witness. Respondents warn the court that this witness' testimony should be scrutinized because in other phases of his testimony he exaggerated and was inconsistent. Moreover, at the time of trial, the witness was an "inmate in the Eastern State Penitentiary."[5] Nevertheless, absent proof by respondents as to how the accident happened, and passing for the moment the oscillating tale of libellant, I accept the testimony of Clark as to how the injury occurred.
There is one further fact which leads me to Clark's testimony. As stated, there were many versions of the story of Finley's injury told to the officers of the ship. Although required by law[6]; the Master made no entry[7] in the log of the "injury * * * and the medical treatment" given. The failure to make an appropriate log entry, where it is reasonable to foresee that the ship's liability may later be questioned certainly creates an inference against the ship's defense, especially where no reasonable explanation is given for the absence of such entries.[8]
*812 I find, therefore, that Finley did, in fact, sustain an injury to his right leg, and in the manner as related at the trial by him and Seaman Clark.
Under the law of the sea, the burden on the shipowner is different from that imposed on others engaged in commerce. He is under the absolute duty, in contradistinction to the duty to exercise reasonable care, to make the vessel seaworthy and to provide for the crew a safe place to work. The H. A. Scandratt, 2 Cir., 87 F.2d 708; The Seeandbee, 6 Cir., 102 F.2d 577. Hence, we turn to the question: Did the respondents fail to maintain the stairway from the poop deck to the mess and seamen's quarters in a safe and proper manner? The testimony of Second Mate Deal as to the condition of the stairway is far from satisfactory.[9] The testimony of Chief Mate Tweekrem falls into the same category.[10] Clark, of course, testified to the poor condition of the stairway. Johansson testified that some of the treads were missing, some had nails missing, and that the stairway was repaired a few days after the accident. The testimony of the ship's Carpenter, Holmstrom, it seems to me, approaches the fact of the condition of the stairway. He said the stairway was in bad condition  some of the brass pieces were worn out, some were loose, and some had no plates whatsoever. Although he could not remember when, he said the Chief Mate had ordered him to repair the stairway.[11] On cross-examination, the proctor for respondents forced the witness to admit that he had no present recollection as to when the repairs took place. The crux of the matter obviously is not when the repairs to the stairway occurred. On the contrary, the essential worth of Holmstrom's testimony rests on the fact that he was aware of the condition of the stairway both prior to and subsequent to the accident.
With the issues of injury and culpability so defined, the sole question remains,  what is the quantum of the libellant's *813 recovery? Bluntly, an examination of the evidence with respect to injury discloses that Finley consciously felt various physical sensations. Whether he was injured as badly as he thought he had been, can only be answered by a resort to the record.
Finley sustained his injury on the evening of November 12, 1939. From then on, and during the voyage home from Houston, he performed no duties as a seaman, although there was some evidence that he could be about. On November 24, 1939, libellant was discharged at Staten Island. As he left ship, the Captain gave him a certificate of hospitalization. Finley immediately went to his boarding house in Marcus Hook, Pennsylvania, without attempting to obtain treatment at either Staten Island, New York, or Philadelphia. Then, four days later, he proceeded to the United States Marine Hospital at Baltimore, Maryland. He remained there for four days.
The clinical chart of those four days, is, it seems to me, of high significance.[12] Upon admission, the swelling of libellant's right leg had subsided; but, according to his statements, the knee would not bend.[13] He was held under observation for a ruptured lateral semilunar cartilage of the right knee. The physical examinations showed a considerable muscle spasm, "but the leg can be fully extended and fully flexed if worked with to overcome muscle pull which appears to be voluntary * * * Pt. [patient] may also be somewhat of a malingerer."[14] (Italics mine.) Later, the chief surgeon examined the libellant. His report states:
"On inspection the knee joint appears perfectly normal. On palpation the kneecap is freely movable, no evidence of excessive fluid in the joint, slight thickening of the infra patellar fat pad, also slight thickness over the anterior tip of the internal semilunar cartilage. Motion normal, slightly painful on acute flexion. The knee joint is stable, there being no excess anterior posterior motion or lateral motion. The power in the quadriceps tendon is good.
"Patient given Ace bandage and advised as to exercise of knee joint. It is my opinion that complete recovery will take place. Estimated length of disability 30 days."[15]
Ten days later, Finley submitted to an examination by a physician selected by respondents. That examination, with its findings, was in accord with that reported by the doctors of the United States Marine Hospital at Baltimore. Libellant had been given, at that institution, a disability of thirty days. Respondents' physician gave libellant two further weeks of disability from the date of his examination.[16]
The next day, however, libellant went to his private physician for examination. Whereas the physician for the respondents had found neither a pathological nor a traumatic condition of Finley's right leg, the libellant's own physician gave detailed findings of injury. He found that Finley had a swollen ankle and calf, but, apparently, the right knee was not swollen. The doctor made a most precise anatomical measurement of both legs. His diagnosis was that libellant had a sprained ankle joint and sprained tendon. Finally, he "strapped his (libellant's) ankle and foot; strapped his calf in what we call the equinas position, and applied a thickened heel pad to keep his foot in downward position; also gave him diathermic treatment." Libellant returned for treatments and was finally discharged on March 12, 1940. At this time his physician thought that his injury  to quote from the brief of the proctor of libellant  "would be entirely cured." Months later, and after *814 the institution of the present suit, libellant, working on another ship, attempted to lift a tank cover weighing 500 pounds and sustained a further injury to his right leg. He returned to his private physician and reported that, as he lifted the tank cover, his right leg "buckled under him and gave way; the tank cover fell and struck his right leg above the knee." This particular accident occurred more than a year and a half after Finley's injury on the Alpha.
So, without stating the effect or result of this later injury, and without designating whether the present disability occurred as a result of slipping on the stairway of the Alpha, or as a result of attempting to lift the 500 pound tank cover, libellant's private physician gave his opinion that Finley's right knee is now permanently injured "unless the knee is opened and the cartilage removed." And yet on the date of examination (June 6, 1941) he gave his patient no treatment. The diagnosis of libellant's private physician must have been made from libellant's former case history, as he did not report any physical findings from this examination. But the former case history, as known to libellant's physician, showed definite injury to Finley's ankle in contradistinction to serious injury to the knee. With reluctance, I must reject the testimony of libellant's private physician in so far as it conflicts with that of the several doctors who examined Finley at the United States Marine Hospital at Baltimore. Theirs was the first examination after the injury. They found no ankle injury at all and were quite skeptical as to whether he suffered anything more than a slight injury to the knee. The findings made by the physician who examined Finley on behalf of the respondents, approximately a week after libellant left the hospital at Baltimore, are strikingly in accord  both as to injury and length of disability  with the findings made by the doctors at the hospital in Baltimore.
I do not find that the libellant has with design and intention attempted to make his injuries more serious than they were in fact. The aggravated sensations which he felt may or may not evidence neurasthenia. I think that the physician who examined Finley on behalf of the respondents has given us the key. He testified: "Lots of times the anatomical injury is cleared up and at times we have a mental rehabilitation which takes time, the same as the actual physical injury does." Finley's sensation of injury was, most likely, beyond his control. I do think, however, as I have said before, that he did sustain some form of injury to his knee when he fell on the stairway, and at the time and for a period thereafter he suffered pain. I think damages of $300.00 are ample for the injury; and such amount will be awarded to him.
In cases of illness or injury at sea, the rule is that the seaman is entitled to charge his maintenance and cure for a reasonable time after the end of the voyage. The Bouker No. 2, D.C., 231 F. 254; Id., 2 Cir., 241 F. 831, certiorari denied 245 U. S. 647, 38 S.Ct. 9, 62 L.Ed. 529; The James E. Ferris, D.C., 1 F.Supp. 1018; Loverich v. Warner Co., 3 Cir., 118 F.2d 690, certiorari denied 313 U.S. 577, 61 S.Ct. 1104, 1105, 85 L.Ed. 1535; The Lizzie Frank, D. C., 31 F. 477; The Cliftwood, D.C., 280 F. 726; McCarron v. Dominion Atlantic R. Co., D.C., 134 F. 762; Silva v. Luckenbach S. S. Co., D.C., 14 F.Supp. 719; Sickner v. Great Lakes Transit Corp., D.C., 17 F. Supp. 330; The Eastern Dawn, D.C., 25 F. 2d 322; Meyer v. Dollar S. S. Line, D.C., 43 F.2d 425; Id., 9 Cir., 49 F.2d 1002; and Frame v. City of New York, D.C., 34 F. Supp. 194.
But where a hospital certificate is tendered to an injured seaman when he leaves ship, the vessel's obligation regarding cure is performed. June v. Pan-American Petroleum & Transport Co., 5 Cir., 25 F.2d 457; The Santa Barbara, 2 Cir., 263 F. 369; see, also, Raymond v. The Ella S. Thayer, D.C., 40 F. 902; and Stevens v. R. O'Brien & Co., 1 Cir., 62 F. 2d 632. Nevertheless, I shall allow libellant something for cure, under the special circumstances of this case.[17] He did not leave the hospital at Baltimore voluntarily. He was discharged. He was still not satisfied that he was not suffering from a serious injury. Finley engaged his private physician on December 13, 1939. He was treated twice in December, four times in January, twice in February, and at least once in March. His physician stated that the ordinary case of a sprain should be cured in several weeks. While the ordinary person would probably be cured of the injury in suit within at least four weeks, I am in agreement with the statement of *815 the examining physician for the respondents, which I have just referred to, that in some cases  of which I find this to be one  there is the necessity for mental rehabilitation which takes time even after the actual physical injury is cleared. The Doctor's charges were $5.00 for the first visit and $3.00 thereafter. I shall thus allow the libellant the sum of $23.00 for cure. This includes payment of the physician's services from December up to February, 1940.
The evidence as to maintenance shows it cost libellant $2.07 per day. The libellant should not be allowed any maintenance for the period when he was a patient for four days at the hospital in Baltimore. Moreover, as this court once before said:[18] "The ship is not an insurer and is not obligated to provide maintenance and cure beyond a reasonable period (The Pochasset, D.C., 281 F. 874), nor for an indefinite length of time or where a cure has been effected as nearly as possible in a particular case." The respondents argued that as the doctors at the United States Marine Hospital and their own examining physician gave libellant a thirty-day disability, and libellant's private physician stated that ordinarily a sprain should be cured in several weeks, maintenance should not be allowed beyond the first of January, 1940. I think it more equitable, under the special findings made here, to grant maintenance up to the following month. Accordingly, I award the sum of $134.55 for maintenance.
II. During libellant's cross-examination of Dr. Russell, the following occurred:
"XQ. Dr. Russell, did you refresh your recollection in this case? A. Yes, I just looked at the report."
The proctor for libellant then asked for the production of all medical reports made by the witness with respect to the injury in suit, as well as to another injury which the libellant had sustained on the same ship some months previously. The demand was refused by the proctor for respondents on the ground that a cross-examiner is not entitled to inspect documents from which the witness has refreshed his memory while "off the witness stand." Apparently, the witness had re-read his reports at some time prior to the trial.
At the trial, I instructed respondents' proctor to produce, but reserved a final ruling until the determination of the case.
The law is clear that if Dr. Russell had refreshed his recollection by referring to his reports on the stand, libellant's proctor would have had the right to inspect them. See cases cited in annotation at 125 A.L.R. 194 et seq. Respondents concede this but argue that the rule is restricted to those instances where the witness refreshes his recollection "while on the witness stand." Though there are authorities to support this contention (5 Jones, Commentaries on Evidence, 2nd Ed., § 2387; United States v. Goldman, 2 Cir., 118 F.2d 310, certiorari granted 62 S.Ct. 119, 86 L.Ed. ___ [vacating 313 U.S. 588, 61 S.Ct. 1109, 85 L.Ed. 1543, denying certiorari]; Lennon v. United States, 8 Cir., 20 F.2d 490), I do not find any rational basis for such a restriction of the rule.
Under what I consider the better view, the cross-examiner is entitled to inspect documents used by a witness to refresh his recollection, whether they are so used at the trial or prior to that time. 3 Wigmore, on Evidence, 3rd Ed., § 762; State v. Deslovers, 40 R.I. 89, 100 A. 64; Dr. R. D. Eaton Chemical Co. v. Doherty, 31 N.D. 175, 153 N.W. 966. Professor Wigmore suggests the wisdom of this view when he says (§ 762):
"The rule should apply, moreover, to a memorandum consulted for refreshment before trial and not brought by the witness into court; for, though there is no objection to a memory being thus stimulated, yet the risk of imposition and the need of safeguard is just as great. It is simple and feasible enough for the court to require that the paper be sent for and exhibited before the end of the trial."
The cross-examiner should be permitted to show that the memorandum is in conflict with the witness' testimony as to what his recollection is.[19] Thus, I now rule that libellant was entitled to examine and inspect the medical reports made by the respondents' witness.
The proctors for the parties may submit an appropriate order or decree. The findings of fact and conclusions of law herein stated are believed by me to be sufficient in *816 accordance with the admiralty rule; but if the proctors prefer specific findings of fact and conclusions of law, they may submit their proposed findings for my consideration.
NOTES
[1] Libellant Finley was serving as a member of the crew in the capacity of able bodied seaman at the rate of pay of $85.00 per month. He had signed articles on the vessel at Marcus Hook, Pennsylvania, on November 4, 1939.
[2] Those who participated in this cause were:

(a) For the libellant: Alvin Thomas Clark, seaman; William Holmstrom, ship carpenter; Karl Johansson, ship pumpman. Not of the crew  Dr. Abraham Myers, libellant's private physician.
(b) For the respondents: Captain George B. Kehoe, master of the vessel; Jans Tweekrem, chief mate; Carl Hal Deal, second mate. Not of the crew  Dr. Charles T. Russell, examining physician for respondents.
[3] Libellant immediately after the accident described his injured leg as being "in a stunned condition."
[4] Finley reported to the Captain that he fell down a ladder leading from the navigation bridge to the amidship deck. He told the Chief Mate, who visited Finley twice daily on the return voyage from Houston, three conflicting versions of the injury to the knee, none of which was in accord with the allegations subsequently made in the libel. For example, he reported to Tweekrem that he had "run into the ladder going up to the bridge"; later he said that he "ran into a valve on deck"; and, again, finally, he told the chief mate that "he didn't know exactly how it happened."
[5] Cf. Rule 106 of the proposed Code of Evidence which excludes evidence of crime not involving dishonesty or false statement.
[6] 46 U.S.C.A. § 201.
[7] The only entry after the injury was the laconic minute made each day: "Finley laid up."
[8] For cases discussing the evidentiary value of a ship's log see: The Georgian, 5 Cir., 76 F.2d 550; The Windrush, 2 Cir., 5 F.2d 425, 1925 A.M.C. 150; Scottish Nav. Co. v. Munson S. S. Line (The Dunolly), 2 Cir., 10 F.2d 708, 1926, A.M.C. 306; The Ambridge, D.C., 18 F. 2d 115, 1926 A.M.C. 492.
[9] First the witness said the stairway was in good condition. Later, on cross-examination, when pressed by counsel, the following occurred:

"Q. * * * Mr. Deal, I am asking you whether you remember specifically the condition of these metal treads as they existed at the time? A. Well, I had better answer No to that."
[10] Tweekrem said in his deposition that he could not recall seeing any broken treads during the voyage. While it was his detail to supervise all repairs, he kept no records of any work done. Apparently, he had no knowledge that the ship carpenter repaired the stairway either immediately after the accident or some time later after the return voyage. According to the testimony of the carpenter, there was, however, a work book actually kept aboard. It is difficult to believe that no record book was kept. Clearly, the chief officer, under ordinary routine, would keep an account of work done by those members of the crew under his command. Certainly there must have been some procedure under which the master would approve requisitions for supplies.

The proctor for libellant cogently comments on the absence of the work book, in his brief at p. 24 et seq. He writes:
"It is incredible that there should not have been a work book kept. The production of such a work book would have disclosed whether or not any repairs were made to the steps in question. It may very well be that the chief officers, as well as the captain and second officers, were in fear of criticism for not having taken care of this very defective stairway long before, and, accordingly, were most reluctant to admit its actual condition. In this same connection, it is significant to note that Captain Kehoe was asked concerning the condition of the stairway only after November 13, after which time the Captain was actually testifying concerning the condition of the stairway after the metal treads had been replaced by wooden strips. In this regard, it is most significant to note that it would have been a comparatively simple matter for the respondents to have taken pictures of the stairway on board their vessel, so that the court could have seen its present condition. If there were no repairs made, as respondents' witness alleges, then the original metal treads would still be upon the stairs. The failure of the respondent to introduce any pictures supports the testimony that there had been repairs and that the metal treads have been removed."
[11] His testimony reads: "Chief officer told me to take all them pieces away, make wooden pieces  three liners  seven steps  screw them  fast so it would be A number one, I did so." When asked about the condition of the stairway, the witness said: "It was very bad condition."
[12] For the importance given United States Marine Hospital records, see Ulm v. Moore-McCormack Lines, 2 Cir., 115 F.2d 492, rehearing denied 117 F.2d 222, involving injury sustained by a seaman from falling down a companionway ladder leading from the main deck to the sleeping quarters.
[13] The chart shows that libellant had "to walk on it stiff legged. Not much pain now but just cannot bend knee." U. S. Public Health Service (Baltimore, Md.) Register No. 30747.
[14] Id. The report discloses further: "Examination at this time reveals no definite pathology. The pt. [patient] seems to exaggerate his difficulties with his right knee. Seen by Chief Surgeon."
[15] The nub of the report perhaps is found in the concluding sentences:

"The diagnosis in this case is questionable. There is also a suggestion that this patient may be over-estimating his disability and his symptoms. * * * Recommend discharge."
[16] The respondents' examining physician said: "* * * from the demeanor and actions of this man he does not appear to be suffering any real pain but more with the desire to obtain as much as possible in settlement."
[17] "The business of the judges is to decide particular cases." J. Frank, Law and The Modern Mind, 5th Ed., p. 127.
[18] The W. H. Hoodless, 38 F.Supp. 432, 434, Welsh, J.
[19] However, the contra rule should be followed, it would appear, in a criminal case where the memorandum is a part of the Government's case. See Goldman v. United States, 62 S.Ct. 993, 86 L.Ed. ___, decided April 27, 1942.