475 A.2d 773

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Catherine Spear FRIED, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 2, 1982.

Filed April 13, 1984.

Petition for Allowance of Appeal Denied Aug. 1, 1984.

James B. Jordan, Assistant District Attorney, Media, for Commonwealth, appellant (at No. 1344) and appellee (at No. 1435).

Norris E. Gelman, Media, for appellant (at No. 1435) and for appellee (at No. 1344).

Before WICKERSHAM, ROWLEY and McEWEN, JJ.

McEWEN, Judge:

Catherine Spear Fried, hereinafter defendant, was convicted by a jury of first degree murder. Post-verdict motions were timely filed and argued before a court en banc which granted defendant a new trial on the grounds that the Commonwealth had failed to establish the corpus delicti of murder beyond a reasonable doubt *prior* to introducing

certain admissions made by the defendant. The Common-
wealth has appealed from the order of the court en banc,
and argues that the corpus delicti was properly established
and that the admissions made by the defendant were,
therefore, properly admitted. The defendant has also filed
an appeal, alleging that since the court en banc correctly
concluded that the corpus delicti was not established, it was
error to order a new trial as such a conclusion requires that
she be discharged.[1] While we agree that appellant is enti-
tled to a new trial, we do so for reasons other than those
expressed by the court en banc.[2]

It is well-settled that before the Commonwealth may
introduce a confession or admission made by an accused, it
must first establish by independent evidence that a crime
has in fact been committed. *Commonwealth v. Small-
wood*, 497 Pa. 476, 483, 442 A.2d 222, 225 (1982); *Common-
wealth v. Byrd*, 490 Pa. 544, 556, 417 A.2d 173, 179 (1980);
*Commonwealth v. Moore*, 466 Pa. 510, 513, 353 A.2d 808,
809 (1976); *Commonwealth v. Cockfield*, 465 Pa. 415, 420,
350 A.2d 833, 836 (1976); *Commonwealth v. Elder*, 305
Pa.Super. 49, 51, 451 A.2d 236, 237 (1982); *Commonwealth
v. Frison*, 301 Pa.Super. 498, 504, 448 A.2d 18, 21 (1982).
This evidentiary requirement, known as the corpus delicti
rule, "is rooted in a hesitancy to convict one of crime on the
basis of his own statements only. 'The grounds on which
the rule rests are the hasty and unguarded character which
is often attached to confessions and admissions and the
consequent danger of a conviction where no crime has in
fact been committed ....' " *Commonwealth v. Moore*,

---

**1.** Both appeals are properly before this Court. Appellant argues that
she is entitled to an absolute discharge while the Commonwealth
argues "the sufficiency of the evidence establishing the corpus delicti,
a question of law in a case such as this where a verdict of 'not guilty'
has not been rendered." *Commonwealth v. Moyer*, 277 Pa.Super. 172,
174 n. 1, 419 A.2d 717, 718 n. 1 (1980). *See* Pa.R.A.P. 311(a).

**2.** The defendant's contention that she is entitled to an absolute dis-
charge is meritless in light of our holding that the corpus delicti was
established, thus rendering the admissions made by the defendant
admissible in evidence. *See Commonwealth v. Frazier*, 411 Pa. 195,
201–202, 191 A.2d 369, 372–373 (1963).

*supra,* 466 Pa. at 513, 353 A.2d at 809 *quoting Commonwealth v. Ware,* 459 Pa. 334, 365, 329 A.2d 258, 274 (1974). *Accord Commonwealth v. Leamer,* 449 Pa. 76, 83, 295 A.2d 272, 275 (1972); *Commonwealth v. Palmer,* 448 Pa. 282, 286, 292 A.2d 921, 922 (1972); *Commonwealth v. Turza,* 340 Pa. 128, 134, 16 A.2d 401, 404 (1940); *Commonwealth v. Herman,* 288 Pa.Super. 219, 230, 431 A.2d 1016, 1022 (1981).

■ However, while the corpus delicti rule requires that the Commonwealth establish through independent evidence that a crime has occurred before the admissions of an accused may be admitted in evidence and the case submitted to the fact-finder, the threshold requirement that the corpus delicti of the crime be established *"is not equivalent to the Commonwealth's ultimate burden of proof.* Although independent corroborative evidence is insufficient if it is merely equally as consistent with accident as with crime, *Commonwealth v. Leslie,* 424 Pa. 331, 227 A.2d 900 (1967), the prosecution has no duty to exclude the possibility of accident in order to establish the corpus delicti. Before introducing an incriminating out-of-court statement the Commonwealth *need not prove the existence of a crime beyond a reasonable doubt." Commonwealth v. Byrd,* 490 Pa. 544, 556, 417 A.2d 173, 179 (1980) (citations omitted) (emphasis supplied). *Accord Commonwealth v. Moore, supra* 466 Pa. at 514 n. 2, 353 A.2d at 810 n. 2; *Commonwealth v. Ware, supra* 459 Pa. at 367 n. 43, 329 A.2d at 275 n. 43.

■ Thus, the rule requires the Commonwealth must sustain an initial burden of proof by preliminarily establishing to the satisfaction of the trial judge that the death occurred under circumstances which were *more consistent* with criminality than with natural causes or accident. Once the Commonwealth has sustained this initial and preliminary burden of proof, which is admittedly slight, the admissions of the accused become admissible. It is for the trial judge to decide whether the Commonwealth has sustained the burden of preliminarily establishing the corpus delicti.

This preliminary burden of proof must be distinguished from the Commonwealth's *ultimate* burden of proof, namely, the requirement that it establish beyond a reasonable doubt each and every element of the crime to the satisfaction of the fact-finder. It is only when the fact-finder— here, the jury—is satisfied beyond a reasonable doubt that each and every element of the crime has been established that a verdict of guilty may be rendered. When, in a jury trial, the corpus delicti of the crime is in issue and the Commonwealth seeks to use admissions of the accused as substantive evidence of the *crime*, the court, as we will hereinafter more carefully explain, must instruct the jury to first pass upon whether sufficient evidence, aside from any admissions made by the defendant, has been offered to establish beyond a reasonable doubt the corpus delicti of the crime. Only if the jury is first satisfied that the evidence, independent of the admissions of the defendant, establishes beyond a reasonable doubt the occurrence of the crime, may it proceed to consider the admissions of the defendant as substantive evidence of the *guilt* of the accused.

The defendant was indicted for the murder of her husband, Paul Fried, M.D. Thus, it was incumbent upon the Commonwealth to establish to the satisfaction of the judge the corpus delicti of murder by evidence independent of admissions made by Mrs. Fried. The corpus delicti of murder consists of evidence " 'that a human being is dead and that such death took place under circumstances which indicate criminal means or the commission of a felonious act.' " *Commonwealth v. Ware, supra* 459 Pa. at 365, 329 A.2d at 274 *quoting Commonwealth v. Milliken,* 450 Pa. 310, 317, 300 A.2d 78, 82 (1973). *Accord Commonwealth v. Kingsley,* 480 Pa. 560, 575, 391 A.2d 1027, 1035 (1978); *Commonwealth v. Tallon,* 478 Pa. 468, 473, 387 A.2d 77, 80 (1978) (Opinion in Support of Affirmance); *Commonwealth v. Burns,* 409 Pa. 619, 625, 187 A.2d 552, 556 (1963); *Commonwealth v. Davis,* 308 Pa.Super. 204, 213, 454 A.2d 92, 97 (1982) allocatur denied February 28, 1983; *Common-*

*wealth v. Williams,* 273 Pa.Super. 578, 582, 417 A.2d 1200, 1202 (1980).

The Commonwealth sought to establish at trial that the defendant, Mrs. Fried, had caused the death of her husband, Dr. Fried, during the early morning hours of July 23, 1976 by smothering him with a pillow while he slept. The defense contended that Dr. Fried died from natural causes. The Commonwealth was required to establish therefore, prior to introducing admissions made by appellant, that Dr. Fried's death "took place under circumstances which *indicate[d]* criminal means . . . ." *Commonwealth v. Ware, supra.* The court *en banc* concluded that the evidence, independent of the admissions allegedly made by the defendant, as recited hereinafter, was insufficient to sustain the Commonwealth's preliminary burden of establishing the corpus delicti of murder. We shall, therefore, recite the evidence produced during the trial which was relevant to the cause of Dr. Fried's death, excluding admissions allegedly made by the defendant.

The defendant and Dr. Fried were married in July of 1975. The marriage was a stormy one which involved frequent arguments and occasional physical violence. At the time of Dr. Fried's death on July 23, 1976, the parties were residing in separate residences.

Dr. Fried, who was approximately 61 years of age, had been treated for mild diabetes and hypertension and may have suffered a mild, "silent" heart attack prior to March of 1976. On March 2, 1976, Dr. Fried was brought by the defendant and the police rescue squad to the emergency room of Jefferson Hospital suffering from a non-lethal overdose of drugs and alcohol. Dr. Fried refused to be admitted and left the emergency room, against medical advice, a few hours later. Approximately two months thereafter, on April 29, 1976, Dr. Fried was again brought by the defendant and the rescue squad to the emergency room suffering from the combined effects of drugs and alcohol. Dr. Fried was admitted as a patient at this time

for treatment of a drug and alcohol dependency [3] as well as for treatment of a broken neck bone sustained in a fall a few days prior to his admission to the hospital. Upon release from the hospital one month later, Dr. Fried, still wearing a neck brace, moved into the defendant's apartment in the Penn Towers Apartment building for a period of convalescence. When, early in July the police responded to a report concerning a disturbance at the Penn Towers Apartment and discovered the defendant and Dr. Fried arguing in the hallway outside of their apartment, Dr. Fried complied with the officers' suggestion that he leave the apartment temporarily. Thereafter, on July 21, 1976, one of the same officers noticed a disturbance on the street outside of the Penn Towers Apartment building. The defendant and Dr. Fried were arguing and both were pulling at a small bag which Dr. Fried was trying to place in his receptionist's car.[4] The defendant, who was extremely agitated, insisted to the officer that he was under a duty to arrest Dr. Fried as he "was a doctor" ... "was a junkie" ... and "was prescribing his own narcotics." The officer explained that he could not arrest Dr. Fried and after more discussion, all of the parties proceeded to the Central Detectives' office. The defendant signed a complaint against Dr. Fried which resulted in his arrest for harassment. Dr. Fried then returned to his residence on Waverly Street.

Mrs. Ruth Kennedy, a business partner of the defendant, testified that on July 21, 1976, she and Gerald Sklar delivered a suitcase to Dr. Fried at his Waverly Street home following this incident. Mrs. Kennedy testified that Dr. Fried "looked terrible—he had—he had on a bathrobe and the bathrobe was hanging open—that's all he had on—and he was completely exposed at the time. He didn't look like

**3.** Dr. Fried was admitted on April 29, 1976, and discharged on May 29, 1976. The attending physician, Dr. Griffith testified at trial that Dr. Fried was an active alcoholic and drug addict at the time of his admission to the hospital.

**4.** Dr. Fried had called his receptionist earlier in the day and requested that she pick him up at the Penn Towers and assist him in moving his possessions back to his Waverly Street home.

he knew—I don't think he even knew who I was." Mrs. Kennedy also testified that the defendant had told her that the following day, July 22, 1976, Dr. Fried had called her and requested that she bring a sandwich to him at the Waverly Street house.[5] The defendant told Kennedy that she had purchased a hamburger and then stopped at the Waverly Street home of Mr. Norman Berman so that he might accompany her into the house while she delivered the sandwich to Dr. Fried. Mr. Berman did so and testified that he heard two voices conversing in normal tones while he waited on the first floor.[6]

The same date, July 22, 1976, the defendant contacted Robert Brotman, M.D., Chief Psychiatrist of the out-patient clinic at Jefferson Hospital, by telephone at approximately 4:00 p.m., and told Dr. Brotman that she believed her husband to be in need of psychiatric help and wanted him to be evaluated, possibly for an emergency commitment. Dr. Brotman agreed to meet Mrs. Fried at his office the following morning and to proceed from there to the residence of Dr. Fried. The defendant and Ruth Kennedy arrived at Dr. Brotman's office, as arranged, and proceeded to Dr. Fried's home. They arrived at approximately noon and Dr. Brotman and Mrs. Kennedy remained downstairs while the defendant went up to the bedroom. Dr. Brotman testified that upon hearing the screams of the defendant, he ran up the stairs and saw Dr. Fried lying on his stomach naked between the bed and the night table. Dr. Brotman pro-

---

**5.** Another witness, Gerald Sklar, testified that he visited the Waverly Street house with the defendant on the evening of July 22, and observed the defendant take a glass of liquor upstairs to Dr. Fried. Sklar testified that the defendant had told him that between the alcohol and the sedatives he had taken, Dr. Fried would be rendered "immobile." Sklar testified that the defendant suggested that he go back to the house alone or with her and kill her husband, both of which suggestions he refused.

**6.** Dr. Fried may not have been cooking for himself at this time. Mrs. Davis, a neighbor, testified that Dr. Fried had also asked her to bring a sandwich to him on the 21st or 22nd of July. Mrs. Davis delivered the requested sandwich to Dr. Fried, who was in bed at the time.

nounced Dr. Fried dead and the police and medical examiner's office were notified.

An investigation of the scene revealed no evidence of criminality. The defendant was interviewed and told investigators that Dr. Fried had a history of drug and alcohol abuse, that she had seen pills scattered in the bathroom and a bottle of whiskey in the kitchen on the previous day, and that a week earlier Dr. Fried had been under the influence of drugs and had assaulted her. Based upon his investigation at the scene and the information received from the defendant, Halbert Fillinger, M.D., Assistant Medical Examiner for the City of Philadelphia, executed a death certificate indicating that Dr. Fried had died as a result of suicide by ingestion of unknown substances. After Dr. Fillinger took blood, urine and stomach content samples [7], the body was released to a funeral home where it was embalmed. When Dr. Fried's daughter, Mrs. Carlie Haas, insisted to Marvin Aronson, M.D., Chief Medical Examiner of Philadelphia, that it was impossible to believe that her father's death was the result of suicide and requested an autopsy, Dr. Aronson refused to perform an autopsy unless Mrs. Haas executed an affidavit of criminality. Mrs. Haas refused to execute such an affidavit and instead retained Milton Halpern, M.D., former Medical Examiner for the City of New York, to perform an autopsy. Dr. Halpern performed the autopsy upon the embalmed body of Dr. Fried five days after the death, on July 27, 1976, with Dr. Aronson present as an observer for approximately 80% of the autopsy. Dr. Halpern issued on September 8, 1976, a lengthy report containing detailed descriptions of his observations as well as the results of chemical tests for alcohol and drugs and concluded that, based upon the autopsy and toxicological

7. The toxicological findings upon the samples taken by Deputy Medical Examiner Fillinger were not reported until six months later on January 17, 1977, and refuted the conclusion that Dr. Fried's death had been the result of suicide.

studies of body samples, Dr. Fried's death had not been the result of suicide [8] and was attributable to natural causes.

Thereafter, on January 17, 1977, the Philadelphia Medical Examiner's office issued a report of the results of chemical analyses of the blood, urine and stomach content samples removed by Dr. Fillinger which confirmed Dr. Halpern's findings that there was no alcohol and insufficient amounts of drugs to cause death. The body of Dr. Fried was then released by the Medical Examiner's office and cremated on February 15, 1977. Dr. Aronson issued a second death certificate on May 9, 1977, in which the cause of death was listed as "undetermined".

When Dr. Halpern died a few months after issuing his report, the Commonwealth retained Dr. Michael Baden, Deputy Chief Medical Examiner of New York City, as an expert witness. Since the body of Dr. Fried had been cremated prior to his retention, Dr. Baden based his opinions upon the medical and pathological evidence collected by Dr. Halpern and by the Office of the Medical Examiner.[9] Dr. Baden testified at trial that it was his expert medical opinion, to a reasonable degree of medical certainty, that

8. The toxicological study of Dr. Halpern disclosed that there were prescription drugs in amounts within a high-therapeutic dosage range in the body. No traces of alcohol remained. Dr. Halpern's report included the following conclusions:

> There is no evidence either from the circumstances or the autopsy or chemical examination that the deceased committed suicide in any manner. There is ample autopsy evidence that extensive disease which reasonably can be considered as the basis of a natural death with symptomatology during life to account for the use of various medications.

9. Dr. Baden based his testimony upon a review of the following: (1) descriptions of the corpse; (2) descriptions of hemorrhages and abrasions to the neck, face and trunk of the decedent and of hemorrhages in the white of the eyes contained in the report prepared by Dr. Halpern, who performed the autopsy; (3) colored photographs of the body taken by Dr. Halpern during the autopsy, showing both internal hemorrhages and external abrasions to the neck and face; (4) tissue samples removed from the body at the autopsy and preserved by Dr. Halpern, including heart tissue samples; (5) toxicological analysis of stomach fluid blood and urine samples; (6) photographs showing the position of the body at the time of discovery; (7) hospital and medical records of the deceased; and (8) reports and records maintained by the Philadelphia Medical Examiner's Office.

Dr. Fried died either as a result of natural causes *or* suffocation. Dr. Baden testified that "[t]he factors that are consistent with and suggestive of smothering, and which makes me feel that smothering is the most likely diagnosis, are the injuries to the face and neck, hemorrhages in the whites of the eyes—." [10] Dr. Baden was, however, unable to state that suffocation was, to a reasonable degree of medical certainty, the cause of death of Dr. Fried.[11] Rather, Dr. Baden testified that "on the basis of the information, on the basis of the information presented thus far, and I underline that, because in fairness there's other information always applicable in determining the cause of death which we haven't discussed, we never make it only in the autopsy, but on the basis of the information thus far, I would have to conclude, for purposes of the death certificate, that the cause of death is undetermined at this time, even though the most—it's entirely consistent with and most suggestive, to my mind, of suffocation, I can't rule out heart disease, I can't prove it, so that I would have to leave it undetermined between suffocation and heart disease." Dr. Baden testified that he could not give a cause of death for purposes of a death certificate but that in his opinion, which was *not* based upon a reasonable degree of medical certainty, the cause of death was suffocation. Dr. Baden testified, however, that if death was caused by smothering, then that death was undoubtedly the result of a criminal agency.

10. The autopsy report of Dr. Halpern had described internal hemorrhages to the neck and head, and abrasions of the face, all of which Dr. Halpern concluded had been sustained after death. Dr. Halpern had also noted petichel hemorrhages in the white part of the eyes, a sign which Dr. Baden testified was more indicative of suffocation although not dispositive of such standing alone. Bleeding in the neck and facial area, according to Dr. Baden, would have occurred while Dr. Fried was alive and these marks suggested a struggle during which pressure was applied to the neck and head. Dr. Aronson testified that in his expert opinion the internal hemorrhages were a result of the embalming process and that the petichel hemorrhages were caused by drying out of the conjunctivae while the body was in the custody of the funeral director or the Medical Examiner's office.

11. Q. Dr. Baden: "Can you tell this jury that suffocation, to a reasonable medical certainty, was the cause of death of Dr. Fried?" A. "No, I cannot say that to the jury—."

Philadelphia Chief Medical Examiner Marvin Aronson, M.D., was called by the defense as an expert pathologist and testified that while he still did not have an opinion with a reasonable degree of medical certainty as to the cause of death of Dr. Fried, "the chances of the death in this instance, with the history as I know it of being related to criminality are less than the chances of it being related to natural death or to accident or to suicide, in my opinion." Dr. Aronson also testified that it was his opinion that the defendant could not have held Dr. Fried down and smothered him as Gerald Sklar, a principal prosecution witness, had alleged.[12]

The court en banc correctly concluded that the expert medical testimony on causation did not establish beyond a reasonable doubt that Dr. Fried's death was the result of a homicide. However, "the proof necessary to establish the corpus delicti in order to render a confession admissible must be carefully distinguished from the Commonwealth's ultimate burden of proof." *Commonwealth v. Moore, su-*

12. The evidence of admissions allegedly made by defendant concerning the death of her husband was provided by Commonwealth witnesses Gerald Sklar and Michael Selkow. Both testified that defendant had admitted killing her husband by placing a pillow over his face and holding it there while he struggled and died. Sklar had previously been convicted of murder based upon statements he had made in an attempt to be admitted to the Federal Witness Protection Program and to secure a promise from the federal government of a guaranteed salary, guaranteed admission and graduation from Harvard Law School, a new identity and assistance in establishing a civil law practice in a western state. Sklar alleged that Selkow had asked him to arrange for the murder of two of Selkow's business associates. Sklar was convicted of both murders. Selkow was never charged in connection with the deaths and contended that the statements made by Sklar concerning Selkow's involvement were part of an extortion scheme. FBI Agent Paul Cryan testified at Mrs. Fried's trial that Sklar informed him during an interview conducted to determine Sklar's eligibility for the Federal Witness Protection Program that Dr. Fried had died from natural causes and that shortly thereafter Sklar, Selkow and another individual had burglarized the Waverly Street home of Dr. Fried. The defense contended that Sklar had fabricated the statements allegedly made by the defendant just as he had fabricated the story of Selkow's involvement in the murders of Edward Rauer and Abraham Fishman. *See Commonwealth v. Sklar,* 497 Pa. 404, 441 A.2d 1201 (1982).

*pra* 466 Pa. at 515, 353 A.2d at 810. *Accord Commonwealth v. Byrd, supra* 490 Pa. at 556, 417 A.2d at 179. " 'The corpus delicti is sufficiently established if the circumstances of the death are *consistent* with crime, even though they may also be consistent with' other causes of death." *Commonwealth v. Tallon, supra* 478 Pa. at 474, 387 A.2d at 80 *quoting Commonwealth v. Frazier,* 411 Pa. 195, 202, 191 A.2d 369, 373 (1963) (emphasis supplied). *Accord Commonwealth v. Cockfield, supra* 465 Pa. 420, 350 A.2d at 836; *Commonwealth v. Boykin,* 450 Pa. 25, 29, 298 A.2d 258, 260 (1972); *Commonwealth v. Gockley,* 411 Pa. 437, 454, 192 A.2d 693, 702 (1963); *Commonwealth v. Ross,* 403 Pa. 358, 367, 169 A.2d 780, 785 (1961); *Commonwealth v. Williams, supra* 273 Pa.Super. at 584, 417 A.2d at 1202.

■ While the evidence of causation offered by the Commonwealth did not establish the cause of death beyond a reasonable doubt, it was sufficient to preliminarily establish the corpus delicti for the purpose of rendering admissible the admissions made by appellant. Moreover, the expert opinion rendered by Dr. Baden, that, under all of the attendant circumstances, suffocation was the *most probable* cause of death, distinguishes this case from those where the independent evidence was equally consistent with both a criminal and a non-criminal explanation for the loss or injury. *See Commonwealth v. Moore,* 466 Pa. 510, 515, 353 A.2d 808, 810 (1976). *Cf. Commonwealth v. Leslie,* 424 Pa. 331, 335, 227 A.2d 900, 903–904 (1967); *Commonwealth v. Elder,* 305 Pa.Super. 49, 451 A.2d 236 (1982); *Commonwealth v. Moyer,* 277 Pa.Super. 172, 419 A.2d 717 (1980); *Commonwealth v. Winter,* 174 Pa.Super. 35, 98 A.2d 221 (1953). While Dr. Aronson testified that it was his expert opinion that Dr. Fried's death was most likely the result of natural or noncriminal causes, the conflicts in the expert testimony were for the fact-finder to resolve. *Commonwealth v. Cartagena,* 272 Pa.Super. 485, 489, 416 A.2d 560, 563 (1979). Similarly, the fact that Dr. Aronson observed the autopsy performed by Dr. Halpern while Dr. Baden had seen neither the body nor the autopsy performed thereon,

was a factor to be considered by the jury, which was free to accept all, part or none of the expert testimony. *Commonwealth v. Newman*, 323 Pa.Super. 394, 400, 470 A.2d 976, 979 (1984); *Commonwealth v. Owens*, 315 Pa.Super. 400, 404, 462 A.2d 255, 257 (1983).

The admissions made by the defendant were, therefore, properly admitted into evidence, the corpus delicti having been preliminarily established by evidence independent of statements made by the defendant.

The court en banc awarded appellant a new trial on the grounds that the Commonwealth had failed to establish the corpus delicti beyond a reasonable doubt and ruled that, therefore, the admissions made by appellant were improperly admitted in evidence. We disagree and conclude that the Commonwealth presented sufficient evidence of the corpus delicti of the crime of murder to permit the introduction of admissions made by appellant. We are constrained, however, to affirm the order of the court en banc awarding appellant a new trial. It is well-settled that an appellate court "may affirm the action of the lower court on a different rationale than that advanced by the lower court. *Commonwealth v. Meischke*, 273 Pa.Super. 134, [139] n. 3, 416 A.2d 1126, 1128 n. 3 (1979)." *Scantlin v. Ulrich*, 318 Pa.Super. 407, 412, 465 A.2d 19, 21 (1983).

As we have observed, a confession or admission made by one accused of homicide is admissible once the corpus delicti has been established by evidence of a death under circumstances which are consistent with a felonious killing. However, before the case is submitted to the jury the trial court is required to instruct the members of the jury that they must first be convinced *beyond a reasonable doubt* of the existence of the corpus delicti before they may consider an admission of or a confession by an accused as evidence of the guilt of the accused.[13] The Pennsylvania Supreme

---

**13.** Veldorale, The Principle of Corpus Delicti and the Evidence Pertaining Thereto, 39 Temple Law Quarterly 1, 41–43 (1965); *See* Note, Proof of the Corpus Delicti Aliunde the Defendant's Confession, 103 U.Pa.Law Rev. 638, 674–675 (1955).

Court, in 1882, held that "when the Commonwealth has given sufficient evidence of the *corpus delicti* to entitle the case to go to the jury, it is competent to show a confession made by the prisoner connecting him with the crime. Under such circumstances the jury should first pass upon the sufficiency of the evidence of the *corpus delicti*. If it satisfies them *beyond a reasonable doubt* that a crime has been committed, then they are at liberty to give the confession such weight as it is entitled to, taking into view the circumstances surrounding it, and the extent to which it has been corroborated." *Gray v. Commonwealth*, 101 Pa. 380, 386 (1882) (emphasis supplied). The Supreme Court reiterated the holding of *Gray* some sixty years later in *Commonwealth v. Lettrich*, 346 Pa. 497, 31 A.2d 155 (1943), when the Court noted that "the rule requires that the jury may not consider such confession as evidence of the defendant's guilt of the crime charged, unless the Commonwealth shall have produced evidence sufficient to convince the jury *beyond a reasonable doubt* that the crime charged was committed by someone." *Id.*, 346 Pa. at 501, 31 A.2d at 157 (emphasis supplied). More recently, in *Commonwealth v. Tallon, supra*, Chief Justice Emeritus Henry X. O'Brien, author of the Opinion in Support of Affirmance[14], noted that "[i]t is the rule in this Commonwealth that *before* a jury can consider a defendant's confession, *it must be convinced beyond a reasonable doubt* that the corpus delicti has been established." *Id.* 478 Pa. at 475, 387 A.2d at 81 (emphasis supplied). *See also Commonwealth v. Hanna*, 267 Pa.Super. 15, 19, 405 A.2d 1280, 1282 (1979) allocatur denied, October 2, 1979.

The trial judge charged the jury on corpus delicti as follows:

Now, ladies and gentlemen of the jury, during the course of the testimony in this case the Commonwealth presented testimony from Mr. Selkow and Mr. Sklar. Now you

14. Justice O'Brien authored the Opinion in Support of Affirmance in which Justices Roberts and Pomeroy joined. Chief Justice Eagen, Justice Nix and Justice Manderino voted to reverse the conviction on the grounds that the corpus delicti had not been established.

must understand the following very clearly: You may not consider whatever these two men may have said as evidence against the defendant unless you first find that a crime was, in fact, committed. The Commonwealth has the burden of proving this matter by evidence independent of any of the statements or testimony given by either of Messrs. Selkow or Sklar.

\* \* \* \* \* \*

You will note that the other evidence whatever it may be, if you find it such, *need not rule out all possibility of accident, natural causes or suicide, or other non-criminal cause. It is enough if you are satisfied that the circumstances are more consistent with a criminal homicide having resulted from the crime of murder than from other causes that might be here involved.* Accordingly, ladies and gentlemen, you may not consider the alleged statements of either Selkow or Sklar as evidence against the defendant unless you first find, *beyond a reasonable doubt,* that a crime was in fact committed. The Commonwealth has the burden of proving this matter by evidence independent of the statement itself, or whatever statements or testimony was given. Please remember, the other evidence that's presented need not prove that the crime was committed by this defendant, but only that a crime was committed by someone. More precisely, therefore, ladies and gentlemen, you should remember this: You must disregard all the statements made by Michael Selkow and Gerald Sklar unless and until you are satisfied by other evidence that, first, Dr. Fried is dead, *and secondly, that his death was probably caused by someone feloniously killing him.*

A killing, ladies and gentlemen of the jury, is felonious if it is either murder or voluntary manslaughter.

You should remember, when considering this aspect of this case: *The other evidence need not rule out all possibility of accident, suicide or natural causes. It is enough if you are satisfied that the circumstances are more consistent with death having been caused by a*

*felonious killing them in some other way.* [N.T. 8.113–8.115] (emphasis supplied).

Thus, while the trial court did at one point instruct the jurors that they were not to consider the admissions allegedly made by the defendant unless they were convinced beyond a reasonable doubt that a crime had been committed, the court repeatedly explained to the members of the jury that they need *only* find that Dr. Fried's death was *more consistent* with a criminal homicide than with natural causes. At best, the jury was faced with two contradictory definitions of the Commonwealth's burden of proving the corpus delicti. "Where a court gives two instructions, one erroneous and prejudicial and the other correct, reversible error occurs." *Commonwealth v. Cain,* 484 Pa. 240, 249, 398 A.2d 1359, 1363 (1979). *Accord Commonwealth v. Holloway,* 212 Pa.Super. 250, 254, 242 A.2d 918, 920 (1968).

The Supreme Court, when faced with the issue we here consider, held that while "the evidence was amply sufficient to establish the existence of the corpus delicti, it was also consistent with and did not rule out the possibility of [natural causes]. Whether the death was due to [natural causes] or caused by the felonious act of another was one of the main issues to be determined. It was, therefore, logical and incumbent upon the jury to resolve this question in the first instance. The defendant's connection with the crime was the next question for decision. In conjunction with this last question, his admissions were significant and for the jury's consideration together with all of the evidence. However, where, as here, the evidence is in doubt as to the manner of the cause of death, the question of the existence of the corpus delicti should first be determined without consideration of the defendant's admission of guilt. *See Gray v. Commonwealth,* 101 Pa. 380 (1882), and *Commonwealth v. Puglise,* 276 Pa. 235, 120 A. 401 (1923). Under the singular facts this case presents, the jury should have been so instructed in crystal clear terms. Unfortunately, this was not done." *Commonwealth v. Frazier,* 411 Pa. 195, 203, 191 A.2d 369, 373 (1963).

We are constrained therefore, to affirm the order of the court en banc which awarded the defendant a new trial. This case is remanded for trial. Jurisdiction is relinquished.

WICKERSHAM and ROWLEY, JJ., concur in the result.