J-S69030-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JEFFREY ELDON MILES, SR. | : | |
| | : | |
| Appellant | : | No. 181 MDA 2018 |

Appeal from the Judgment of Sentence November 20, 2014
In the Court of Common Pleas of Franklin County Criminal Division at
No(s):  CP-28-CR-0001892-2012

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MURRAY, J.

MEMORANDUM BY LAZARUS, J.:          **FILED: NOVEMBER 9, 2018**

Jeffrey Eldon Miles, Sr., appeals from the judgment of sentence entered

in the Court of Common Pleas of Franklin County.  We affirm.

The trial court set forth the facts of this matter as follows:

On August 24, 1995, Angie Daley ("Victim") returned home from
a week at the beach with her family.  At this time, Tangy Harbaugh
(now Tangy Johnson) was the [V]ictim's best friend, and the first
person she visited upon her return from the beach.  During the
visit, the [V]ictim borrowed clothes from Tangy – a green button[-
]up sweater vest and a pair of light[-]blue jeans shorts.  A mutual
friend, Marissa Toney, was also present for this visit.

After visiting with Tangy, the [V]ictim was not seen by her family
or friends for a significant period of time, which led to contact
being made with the National Center for Missing and Exploited
Children.  The [V]ictim's apparent disappearance also led Tangy
to begin making contact with individuals to try and ascertain
where the [V]ictim had gone.  Tangy first made contact with
Marissa Toney, which led her to the Webber residence, and
eventually to a location on Wayne Avenue, where Tangy believed
[Miles] lived at the time.  [] Tangy knew who [Miles] was, as he
was her nephew's father.

Ultimately, the police began an investigation. In August of 2002, Officer Mark King (at the time of trial[,] Chief King) was assigned to the case. Officer King conducted extensive interviews, and searches, but in April 2010[,] the [V]ictim had still not been located. As the case was still open after such an extended period of time, it was referred to the Pennsylvania State Police.

On April 6, 2010, [Miles] was standing on an overpass overlooking Interstate 81, which was reported by motorists to police. [Miles] appeared distraught, repeatedly making comments about suicide. [Miles] also requested a notebook that he wanted the police to read.

Trooper [Aaron] Martin (now Corporal Martin) was the lead investigator of the instant case. On the morning of April 6, 2010, Trooper Martin interviewed Sherry Walters, [Miles'] wife, who gave him consent to search her vehicle. In the process of searching the vehicle, Trooper Martin discovered a notebook that belonged to [Miles]. The notebook included the following writing:

> For those of you who think you know me, you don't for I am a beast. That's the name that is given to the soul. It is bestowed upon those who are chosen. Why we are chosen is unknown but we are many. We know who we are and you love us. But there are two sides to us, a living side and a dying side. We fight amongst ourselves to choose who shall live and who shall die. We do what we do and try to survive.
>
> We know there is a God of evil. And we serve him. But there is a God of good who serves us. We go to him for the person who is chosen for death is doomed. So now we start. It comes upon us. We try to fight.
>
> But we do what we do. We know everything there is to know. And still we do wrong for I am not running. This time is mine. And we do what needs to be done.
>
> . . .
>
> There's a part of me that wants to fight, and that is good. But here's of the beast.
>
> . . .
>
> Do not put in our path. But we put in yours to do you justice. And that is to die. For our destiny is death. 1995, we are

- 2 -

served[!] We want peace. Our peace is death. Within us we don't know what makes up. Kill but now it is time for death. So for that's what brings me here today, beast to beast.

. . .

I'm at peace. Months ago I prayed to the God of good. And I am served. There are those who love the God in evil and that is why we survive. When I die is my destiny. Those who love the God in evil know no better. [It's not your fault,] it's who you are. There's no peace when you fight against who you are.

After discovering the notebook, Trooper Martin went to the overpass, and made contact with [Miles]. Trooper Martin informed [Miles] that he had obtained the notebook from [Miles'] wife. At this point, [Miles] came down off the overpass, was handcuffed, and searched. [Miles] was placed in the back of a patrol unit and read his **Miranda**[1] rights. [Miles] was then transported to Chambersburg Police Department.

[Miles] was again read his **Miranda** rights, and then Trooper Martin and Trooper David Rush conducted the first recorded interview of [Miles]. In the video recording of the interview, [Miles] admitted to killing the [V]ictim with a [two] by [four]. After admitting this, [Miles] offered to take the police to the location of the body. [Miles] led police to the place he left the [V]ictim's body, which is an area called Waynecastle, Pennsylvania, located between Greencastle and Waynesboro.

Trooper Martin then proceeded back to State Police barracks in Chambersburg with [Miles] to continue interviewing him. [Miles] was again read his **Miranda** rights, after which he consented again to the interview. [Miles] was interviewed three times between 3 p.m. and 8 p.m. During that time, [Miles'] **Miranda** warnings were refreshed, and he was provided with food, water, and bathroom breaks. During this time, [Miles] explained that he used a [two] by [four] to kill the [V]ictim because it was handy. [Miles] specified that he struck the [V]ictim twice with the [two] by [four], and then put her into the trunk of his car. [Miles] then drove to the location he ultimately left the [V]ictim, in Waynecastle, Pennsylvania. He explained that once he got there,

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

he opened the trunk, and the [V]ictim popped up[,] saying "Please don't kill me." [Miles] stated that he then struck the [V]ictim a third time in the head, and then discarded the [V]ictim's body at that location. [Miles] also indicated that he left the murder weapon . . . between shrubs and the garage of his residence, and Trooper Mike Dick was able to locate said [two] by [four] precisely where [Miles] indicated he had left it. During the interview, [Miles] stated that the [V]ictim had not deserved to be murdered.

Trial Court Opinion, 6/18/18/, at 6-10 (internal footnotes and citations to the record omitted).

On November 20, 2014, Miles was convicted by a jury of first-degree murder and was immediately sentenced to life imprisonment without the possibility of parole. Thereafter, while still represented by counsel, Miles filed a pro se "Direct Appeal for Denial of Mistrial." As Miles' filing constituted hybrid representation, the trial court directed that no further action be taken on the appeal. Rather, the court directed Miles to either file a request to waive his right to counsel and proceed pro se or discuss the filing of an appeal with his counsel. He did neither.

On November 19, 2015, Miles filed a pro se petition under the Post Conviction Relief Act ("PCRA"),[2] seeking reinstatement of his direct appellate rights. Counsel was appointed and filed an amended petition. After an evidentiary hearing, the PCRA court denied relief. Miles appealed and, on November 14, 2017, this Court issued a memorandum order reversing the PCRA court and remanding for the reinstatement of Miles' direct appellate rights. The PCRA court did so by order dated November 20, 2017. In that

_____

[2] 42 Pa.C.S.A. §§ 9541-9546.

- 4 -

same order, the court appointed counsel to represent Miles in his appeal and directed counsel to file a notice of appeal within 30 days. However, on December 5, 2017, counsel filed a motion to appoint alternate counsel due to a conflict. By order dated December 11, 2017, the court granted the motion and appointed current counsel, Michael Palermo, Esquire, to represent Miles.

On January 24, 2018, Attorney Palermo filed a motion to file a notice of appeal *nunc pro tunc*, as well as a notice of appeal. The trial court never acted on the motion. However, on January 25, 2018, the court issued an order directing Miles to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). After receiving multiple extensions, counsel finally filed a Rule 1925(b) statement on May 14, 2018. The trial court issued its Rule 1925(a) opinion on June 18, 2018.

On appeal, Miles raises the following claims on appeal:

1. Did the [trial] court err in denying [Miles'] [m]otion in [l]imine, where the Commonwealth could not prove the *corpus delicti* due to decomposition, thus the prosecution should have been barred[?]

2. Was the verdict of guilt as to [f]irst[-d]egree [m]urder[] based on insufficient evidence, where the Commonwealth could not provide the cause of death due to the only physical evidence being skeletal remains[?]

Brief of Appellant, at 6.

Before addressing the merits of Miles' claims, we must address the timeliness of this appeal, as it implicates our jurisdiction. **Commonwealth v. Yarris**, 731 A.2d 581, 587 (Pa. 1999) (appellate courts may consider issue of jurisdiction *sua sponte*). "Jurisdiction is vested in the Superior Court upon

the filing of a timely notice of appeal." ***Commonwealth v. Nahavandian***, 954 A.2d 625, 629 (Pa. Super. 2008), citing ***Commonwealth v. Miller***, 715 A.2d 1203, 1205 (Pa. Super. 1998). "This Court does not have jurisdiction to hear an untimely appeal." ***Commonwealth v. Wrecks***, 931 A.2d 717, 720 (Pa. Super. 2007), citing ***Commonwealth v. Green***, 862 A.2d 613, 615 (Pa. Super. 2004).

Here, the trial court ordered court-appointed counsel to file a notice of appeal within thirty days from November 20, 2017. Thus, Miles had until December 20, 2017 to file a timely appeal. When the court appointed new counsel on December 11, 2017, it did not address the time within which counsel was required to file a notice of appeal. Counsel finally filed a notice of appeal on January 24, 2018, along with a motion to file an appeal *nunc pro tunc*. As noted above, that motion was never expressly granted. Indeed, the trial court never even acknowledged that the notice of appeal was untimely filed. If a trial court does not expressly grant *nunc pro tunc* relief, the time for filing an appeal is neither tolled nor extended. ***See Commonwealth v. Dreves***, 839 A.2d 1122, 1128–29 (Pa. Super. 2003).

Miles' notice of appeal was clearly untimely. Nevertheless, we decline to quash his appeal. In ***Commonwealth v. Wright***, 846 A.2d 730 (Pa. Super. 2004), we addressed a similar factual scenario in which the appellant's direct appeal rights were reinstated *nunc pro tunc* following PCRA proceedings. However, counsel did not file a notice of appeal until nearly two months after the order granting reinstatement of appellate rights. Although this Court

determined that the appeal was, in fact, untimely, it declined to quash. In doing so, the Court noted that "the order restoring Appellant's direct appeal rights did not inform Appellant that he had 30 days to file the appeal. Accordingly, we will not fault Appellant for failing to appeal within 30 days of the restoration of his direct appeal rights." **Id.** at 735.

Here, by order dated November 20, 2017, the court reinstated Miles' appellate rights, appointed counsel, and granted counsel 30 days to file a notice of appeal. As Miles was represented by counsel, the court did not send a copy of that order to him. When court-appointed counsel was compelled to withdraw its representation, the order appointing new counsel did not specify the time period in which new counsel was required to file a notice of appeal. Miles was not sent a copy of that order. Thus, as in **Wright**, we decline to punish Miles for the trial court's failure to advise new counsel as to the appeal deadline, or new counsel's failure to apprise himself of the deadline upon his appointment. **See also Commonwealth v. Hurst**, 532 A.2d 865 (Pa. Super. 1987) (trial court required to advise defendant of right to appeal and time within which that right may be exercised; where court fails to so inform defendant, otherwise untimely appeal will not be quashed). We now proceed to address Miles' appellate claims.

Miles first alleges that the trial court erred in not granting his motion *in limine*, in which he sought an order prohibiting the introduction at trial of any of his inculpatory statements, as the Commonwealth was "unable to establish by evidence independent of his statement that the death of [the Victim] is

more consistent with being done by criminal means as opposed to accident or suicide." Motion *in Limine*, 9/9/14, at [3]. Miles argues that, at the preliminary hearing, the coroner, Jeff Conner, did not offer his own opinion, but relied on the expert report of forensic anthropologist Dr. Dennis Dirkmaat. Miles claims that, while the report identified skull fractures on the Victim, there was no evidence – other than Miles' statements to police – as to when or how those fractures were made. Miles is entitled to no relief.

It is well-settled that before the Commonwealth may introduce a confession or admission made by an accused, it must first establish by independent evidence that a crime has in fact been committed. ***Commonwealth v. Fried***, 475 A.2d 773, 775 (Pa. Super. 1984) (citations omitted). "This evidentiary requirement, known as the *corpus delicti* rule, is rooted in a hesitancy to convict one of crime on the basis of his own statements only. The grounds on which the rule rests are the hasty and unguarded character which is often attached to confessions and admissions and the consequent danger of a conviction where no crime has in fact been committed[.]" ***Id.*** (citations and internal quotation marks omitted).

The threshold requirement that the *corpus delicti* of the crime be established is not equivalent to the Commonwealth's ultimate burden of proof beyond a reasonable doubt. ***Id.*** Rather, the rule merely requires the Commonwealth to preliminarily establish, to the satisfaction of the trial judge, that the death occurred under circumstances which were more consistent with criminality than with natural causes or accident. ***Id.*** "Once the

Commonwealth has sustained this initial and preliminary burden of proof, which is admittedly slight, the admissions of the accused become admissible."

*Id.*

Here, at the preliminary hearing, the Commonwealth presented, through the testimony of Coroner Conner, the report of Dr. Dirkmaat, which concluded that the Victim had suffered perimortem[3] blunt force trauma to the cranium, with a minimum of three impacts. Testimony also indicated that the Victim was located in a remote area, suggesting an effort to conceal her remains. The Commonwealth presented evidence linking Miles to the 1995 missing person report filed at the time of the Victim's disappearance. This evidence was sufficient to establish that the circumstances of the Victim's death were more consistent with criminality than with natural causes or accident. ***See id.*** Accordingly, the trial court did not err in denying Miles' motion *in limine*.

Miles next asserts that the evidence adduced at trial was insufficient to support a verdict of first-degree murder. Specifically, Miles claims that the Commonwealth did not prove the cause of death, as the only physical evidence consisted of skeletal remains. This claim is meritless.

Our standard of review is well-settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence

---

[3] "Perimortem" means "taking place at or around the time of death." https://www.merriam-webster.com/medical/perimortem (visited 10/30/18).

to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014), quoting

*Commonwealth v. Estepp*, 17 A.3d 939, 943–44 (Pa. Super. 2011).

A person is guilty of first-degree murder when the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. *Commonwealth v. Baumhammers*, 960 A.2d 59, 68 (Pa. 2008). The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. *Id.* The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body. *Id.* The legislature has defined a "deadly weapon" as:

Any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death of serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury.

- 10 -

18 Pa.C.S.A. § 2301.

At trial, the Commonwealth presented Mile's confession that he had "hit [the Victim] upside the head with a [two-by-four]." N.T. Trial, 11/18/14, at 117. He stated that he hit her twice and then placed her in the trunk of his car. *Id.* at 136. After driving to the wooded area where the Victim's remains were eventually recovered, he opened the trunk of the car and the Victim "popped up" and said "Please don't kill me." *Id.* Miles then hit her a third time with the two-by-four and discarded the body. Miles stated that he had struck the Victim "in the head but more along the face area." *Id.* at 137. He stated that he disposed of the two-by-four between the garage and some shrubs at his residence, where police subsequently recovered it "precisely where Mr. Miles said he had thrown it." *Id.* at 138.

The Commonwealth also presented the testimony of Dr. Dirkmaat, the forensic anthropologist, who testified to within a reasonable degree of medical certainty that the remains to which Miles led police represented a white female approximately 60 inches in height and about 15 to 20 years of age, which was consistent with the biological profile of the Victim. *See* N.T. Trial, 11/19/14, at 69-70. He further testified that the Victim had suffered three separate perimortem blunt-force trauma blows to the skull, injuries not inconsistent with an attack using a two-by-four, and that death had occurred more than five, and likely more than ten, years earlier.[4] *See id.* at 70-71.

---

[4] The Victim disappeared in August 1995 and trial was held in November 2014.

Additionally, Dr. William Black, an expert in dental remains identification, testified that he was called to assist the coroner's office in identifying the remains found on April 6, 2010. He did so by examining the remains available and comparing them with dental records provided by the Victim's dentist. Doctor Black concluded that a filled tooth recovered at the scene[5] was consistent with the records provided. *See id.* at 34.

In sum, the evidence adduced at trial, if believed by the finder of fact, was sufficient to prove that Miles unlawfully and intentionally killed the Victim by using a deadly weapon upon a vital part of the her body. *Baumhammers*, *supra*. Miles confessed to the crime, and the details of that confession were corroborated by the findings of Dr. Dirkmaat, and by the fact that the police found both the Victim and the murder weapon exactly where Miles said they were located. Accordingly, Miles is entitled to no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/9/2018

---

[5] Specifically, a maxillary right central incisor, identified by Dr. Black as "tooth No. 8," was recovered from the remains. This tooth had been filled with composite white filling. Doctor Black examined the tooth and the Victim's dental record and concluded that there was "no inconsistency anywhere between the remains and the dental record." N.T. Trial, 11/19/14, at 34.